[No. D014635. Fourth Dist., Div. One. Mar. 30, 1993.]

JOHN TENWOLDE, Plaintiff and Respondent, v.
COUNTY OF SAN DIEGO, Defendant and Appellant.

## COUNSEL

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Deborah L. Peterson-Lee and Morris G. Hill, Deputy County Counsel, for Defendant and Appellant.

Georgiou & Tosdal and Thomas Tosdal for Plaintiff and Respondent.

## OPINION

**FROEHLICH, J.**—The County of San Diego (County) appeals a judgment requiring it to indemnify Sheriff Lieutenant John Tenwolde (Tenwolde) for attorney fees awarded against him in an underlying lawsuit, *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730 [246 Cal.Rptr. 285] (hereafter *Common Cause*). By special verdict, a jury found (1) Tenwolde was represented by the County in the *Common Cause* suit; (2) the County was requested in writing to defend him; and (3) Tenwolde's actions for which he was found liable were within the scope of his employment. The County contends no substantial evidence supports the three jury findings and the court abused its discretion by finding the indemnity suit ripe for adjudication. We reverse on the grounds the County did not represent Tenwolde and should not, as a matter of public policy, be required to indemnify him for damages arising from illegal political activity.

### FACTUAL AND PROCEDURAL BACKGROUND

Tenwolde joined the sheriff's department in 1970. He worked his way through the ranks and was ultimately promoted to lieutenant in command of the sheriff's public affairs division in October 1984. In that position, Tenwolde's job was to inform the public of the department's crime-related and

crime-prevention-related activities. Tenwolde reported to Sheriff John Duffy.

On February 8, 1985, Duffy told Tenwolde he planned to distribute strongly worded postcards encouraging Chief Justice Rose Bird to resign.[1] The postcards were produced by the Crime Victims for Court Reform, a private political committee, and were designed to be mailed by citizens seeking Bird's resignation or ultimate defeat on retention. The cards were to be available by request at public counters of sheriff's facilities and distributed through deputies. Duffy said the project would be "a controversial undertaking, an educational process . . . that some may consider . . . political, but . . . was not political [because] the confirmation vote for the chief justice was . . . nearly two years away." Tenwolde's job was to inform the public of the availability of the postcards.

Tenwolde distributed about 100 postcards, both on and off duty, and responded to media inquiries. When the supply of postcards was depleted, Tenwolde dispatched a deputy to Los Angeles for additional cards.

In response to media attention and a request by the American Civil Liberties Union that the distribution stop, Duffy and his special assistant, Attorney Janet Houts (Houts), met with County Counsel Lloyd Harmon (Harmon). Anticipating a suit, Harmon told Houts the Office of County Counsel would not represent Duffy. County counsel considered the postcard activities to be illegal political activity not within the scope of employment.

On February 19, California Common Cause and individual taxpayers (collectively Taxpayers) filed a complaint seeking declaratory and injunctive relief against Duffy and "Does" to halt the postcard distribution. Houts forwarded the complaint to county counsel on February 25 with a letter

---

[1]"The postcards stated: 'Chief Justice Bird: [¶] I want a judiciary which is fair and impartial in all of its decisions, and which protects the victim as well as the accused in crimes. As Chief Justice, you have not upheld these basic precepts of justice. You have hurt our entire judicial system through the following:

" 'You have repeatedly decided cases in favor of criminals over victims, which has made our entire judicial system a mockery.

" 'You have embroiled the Court in partisan politics, creating a bias which has no place in the judicial system.

" 'You have used the Supreme Court to stop the death penalty. This is an action which runs counter to the will and law of the people of California.

" 'You have crippled law enforcement, thus endangering the safety of all Californians.

" 'For these reasons, I respectfully request that you resign from your position as Chief Justice of California's Supreme Court!' (Italics omitted.)

"At the bottom of the postcards, in small print, was the name of the committee (Crime Victims for Court Reform) and their address in Los Angeles." (*Common Cause, supra,* 200 Cal.App.3d at p. 738, fn. 2.)

stating: "It is requested that you defend this action and represent the above named party [Duffy] and any Does which may enter into this complaint." Houts received a verbal refusal.

Tenwolde was served as a Doe defendant on February 28 and gave Houts a copy of the summons and complaint. After speaking with Undersheriff Richard Sandberg, Tenwolde called a peace officers' legal defense association for representation. Sandberg then told Tenwolde "Sheriff Duffy passed word to [Tenwolde] that [he] would be covered by the [C]ounty in terms of legal representation." Houts believed she telephoned county counsel requesting it represent Tenwolde and the request was denied.

On February 26 Duffy agreed not to distribute postcards, and the Taxpayers dropped their application for a temporary restraining order.

On March 14, 1986, the court granted summary judgment for the Taxpayers on their declaratory relief claim, finding most of the activity was an illegal expenditure of public funds and personnel on political campaigning. Following entry of judgment, the Taxpayers successfully moved for costs and attorney fees. The court found Duffy and Tenwolde jointly and severally liable in the amount of $14,127.09. Both sides appealed the award, which we affirmed as modified for a sum of $18,804, noting the Taxpayers were also entitled to attorney fees on appeal. (*Common Cause, supra,* 200 Cal.App.3d at p. 756.)

The court awarded the Taxpayers $11,500 for fees on appeal. On July 20, 1988, Tenwolde and Duffy jointly executed promissory notes to third party lenders totaling $36,000 and paid Taxpayers $33,675 of the proceeds in satisfaction of judgment. Tenwolde filed this action seeking indemnity under Government Code[2] sections 825 and 825.2[3] on April 7, 1989.

At trial, Tenwolde testified the goal of the public affairs division is to "maximize the flow of relevant department information to the public through

[2]All statutory references are to the Government Code unless otherwise specified.

[3]Section 825 provides in relevant part: "If an employee . . . of a public entity requests the public entity to defend him against any claim or action against him for an injury arising out of an act or omission occurring within the scope of his employment as an employee of the public entity and such request is made in writing not less than 10 days before the day of trial, and the employee . . . reasonably cooperates in good faith in the defense of the claim or action, the public entity shall pay any judgment based thereon or any compromise or settlement of the claim or action to which the public entity has agreed."

Section 825.2 provides in relevant part: "(a) Subject to subdivision (b), if an employee . . . of a public entity pays any claim or judgment against him, or any portion thereof, that the public entity is required to pay under Section 825, he is entitled to recover the amount of such payment from the public entity. [¶] (b) If the public entity did not conduct his defense against the action or claim, or if the public entity conducted such defense pursuant to an agreement with him reserving the rights of the public entity against him, an employee . . . of a public entity may recover from the public entity under subdivision (a) only if he establishes that the act or omission upon which the claim or judgment is based occurred within the scope of his

as much of the appropriate news media as possible" without disrupting the sheriff's primary responsibilities or divulging confidential information. Tenwolde stated he did not believe making the postcards available to the media and public was prohibited political activity. He thought his actions were "conforming to the expectations of [his] employer" and the public affairs division customarily commented on many controversial topics.[4] According to department regulations, Tenwolde could not contact county counsel directly but was required to request legal representation from the County via the legal adviser or the undersheriff.

By special verdict, the jury found Tenwolde was represented by the County, a request was made in writing by or on behalf of Tenwolde to the County to defend him, and Tenwolde was acting within the scope of his employment as an employee of the County when engaging in the conduct for which an award of attorney fees was entered against him. The court entered judgment against the County, ordering it to pay the holders of the promissory notes and costs. The County appeals, complaining the judgment requires the taxpayers to indemnify Tenwolde for "having squandered taxpayer resources in the first place."

## DISCUSSION

In order for an employee to be indemnified by the government entity employer, the employee must follow certain procedural steps and establish that the claim or judgment arises in the context of the employee's scope of employment. Specifically, section 995 requires a public entity, upon written request of an employee, to "provide for the defense of any civil action or proceeding brought against him, in his official or individual capacity or both, on account of an act or omission in the scope of his employment as an employee of a public entity." The public entity may refuse to provide for the defense of the employee "if the public entity determines that . . . [t]he act or omission was not within the scope of his employment; . . ." (§ 995.2.)

If the public entity conducts the defense of the employee (thereby presumptively concluding the employee's actions were within the scope of his

---

employment as an employee of the public entity and the public entity fails to establish that he acted or failed to act because of actual fraud, corruption or actual malice or that he willfully failed or refused to conduct the defense of the claim or action in good faith or to reasonably cooperate in good faith in the defense conducted by the public entity. . . ."

[4]As examples of controversial topics, Tenwolde listed funding for the Astrea helicopter, sales tax for jail construction, the civilian review board, merger of crime labs, victims' rights, asset seizure, increased sentences for gun use, the death penalty, drunk driving, crime problems and the plight of illegal immigrants.

employment), the public entity "shall pay any judgment . . . or any compromise or settlement of the claim . . . ." (§ 825, fn. 3, *ante*.) The public entity may also conduct the defense "reserving the rights of the public entity not to pay the judgment, compromise or settlement until it is established that the injury arose out of an act or omission occurring within the scope of [the employee's] employment . . . ." (§ 825.)

If the employee's defense is not conducted by the public entity, the employee may pay the claim or judgment and recover that amount from the public entity "only if he establishes that the act or omission upon which the claim or judgment is based occurred within the scope of his employment as an employee of the public entity . . . ." (§ 825.2, subd. (b).)

Here, Tenwolde sought indemnity from the County for the fees paid in the Duffy suit, alleging he made a written request for representation, the County in fact represented him, and the judgment awarded against him arose from his acts occurring within the scope of his employment. The County claimed the written request pertained only to Duffy, Houts's "in house" defense of Tenwolde was not "an authorized County defense," and illegal political activity cannot be within the scope of employment.

*County Representation*

■ The County attacks the jury's findings solely on the basis of substantial evidence. Preliminarily, we note the written request for representation of "Duffy and Does" is sufficient evidence to support the jury's first finding. The critical determination for indemnity purposes is the characterization of Houts's defense of Tenwolde because, if that representation equates with "defense by a public entity" without reservation of rights, Tenwolde is entitled to indemnity under section 825. Conversely, if Houts's representation is characterized as "outside" or other than by the public entity, Tenwolde would be entitled to indemnity only if his activities were within the scope of his employment, under section 825.2, subdivision (b).

Houts testified she is an attorney in the position of "special assistant to the sheriff." She is paid by the County and frequently represents the sheriff's department in civil and criminal matters. She cannot bind the County in a settlement agreement for money damages. In her view, she represents the interests of the sheriff's department and county counsel does not direct her. When a deputy sheriff is named in a complaint and wishes County representation, Houts's practice is to make a written request of county counsel. Houts said county counsel knew she represented Tenwolde along with Duffy. In her opinion the activities complained of were within the scope of employment. She thought she represented Tenwolde under a "mutual decision with

. . . Tenwolde[, herself] and the sheriff. And perhaps the undersheriff . . . ."

Under section 25203, the board of supervisors directs and controls the conduct of litigation in which the County or one of its subordinate departments or agencies is a party. The County charter empowers county counsel to "act[] as legal advisor to the Board and represent[] the County and its officers, in their official capacity, in civil actions and proceedings in which they are involved, except when an officer is a defendant in an action prosecuted by the State or County." (San Diego County Charter, § 704.) The board may also employ "outside" counsel to assist County attorneys. (§ 25203.)

Although Houts is an attorney and works for an agency of the County, she is not part of County counsel and therefore lacks the authority to bind the County for indemnity purposes in a suit against a County employee. Had she the authority to do so, no purpose would be served by the procedure requesting County counsel to represent the employee. Under the indemnity provisions of section 825, the public entity must be able to assess the claim against its employee because that assessment is critical to indemnity. The entity must decide, at its peril, whether the activity is within the scope of employment because the entity's duty to indemnify attaches to that determination. If the entity is incorrect, it will be obligated to pay the judgment.

Here, County counsel assessed the complaint as being outside the scope of employment. Had "outside counsel" proved that assessment incorrect, the County would be obligated to pay. Houts, however, as the sheriff's legal adviser, did not have the authority to make a contrary assessment, and in her representation of Tenwolde acted independent of the County, and not as its agent or alter ego.

*Scope of Employment*

Since Tenwolde was not represented in the lawsuit by the County, his right to indemnification for his payment of the judgment rendered against him is dependent upon compliance with the conditions of section 825.2, subdivision (b). He may recover only if: (1) he establishes that his act giving rise to the judgment was "within the scope of his employment as an employee of the public entity," and (2) the County fails to establish that his act constituted "actual fraud, corruption or actual malice . . . ." There is no contention that Tenwolde acted maliciously, fraudulently or in any other manner indicative of an intent to cheat the County. The issue, then, is whether his actions were within the scope of his employment.

The trial and appeal in *Common Cause* conclusively established that Tenwolde's acts were in violation of both state statute and the sheriff's own manual of policy and procedures. (*Common Cause, supra*, 200 Cal.App.3d at pp. 745, 746.) It might be thought that this determination would conclusively resolve the question of scope of employment, since common sense would suggest that it is never within the scope of employment of a sheriff's lieutenant to violate state statute and his own department's regulations.

The difficulty in jumping to this conclusion, however, is that the authorities construing the meaning of "scope of employment" under section 825 et seq. accord an extremely broad interpretation to the phrase. This is perhaps understandable in light of the fact that a principal objective of the statutes is to provide third party claimants, who have been injured by tortious acts of governmental employees, with a source of compensation. (See *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 215-216 [285 Cal.Rptr. 99, 814 P.2d 1341].) Hence, acts which clearly are not authorized by the terms of employment, and are willfully and obviously wrongful, have been held to be within the scope of employment of the governmental servant. (See, e.g., *Mary M.* v. *City of Los Angeles, supra* [rape of an arrested female by on-duty police officer held within the scope of employment]; *Scruggs* v. *Haynes* (1967) 252 Cal.App.2d 256 [60 Cal.Rptr. 355] [assault and battery by police officer in the course of an arrest deemed within scope of employment]; *Neal* v. *Gatlin* (1973) 35 Cal.App.3d 871 [111 Cal.Rptr. 117] [libel by members of tenure committee of state college held within scope of employment].)

For purposes of the claims statute "a public employee is acting in the course and scope of his employment 'when he is engaged in work he was employed to perform or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences.' [Citations.] The phrase 'scope of employment' has been equated with the express or implied power of the public employee to act in a particular instance, and in evaluating his conduct to determine whether it is within the ambit of his authority we are to look not to the nature of the act itself, but to the purpose or result intended. [Citations.] If the object or end to be accomplished is within the employee's express or implied authority his act is deemed to be within the scope of his employment irrespective of its wrongful nature." (*Neal* v. *Gatlin, supra*, 35 Cal.App.3d at p. 875, fn. omitted.) As stated in *Mary M.* v. *City of Los Angeles, supra*, 54 Cal.3d at page 214, "the test for determining whether an employee is acting outside the scope of employment is whether ' "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the

employer's business." ' " (Quoting from *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].)

In light of these authorities it is most difficult to hold as a matter of law that a fact finder could not determine Tenwolde's activities to be within the scope of his employment. What he did was not for his own gain, but for the perceived benefit of the sheriff's department and law enforcement in general. While he should perhaps have known better, he was nevertheless following the instructions of his superior, who had assured him that the activity was appropriate. The nature of the activity, disseminating information and promoting a letter-writing campaign, was germane to Tenwolde's role as lieutenant in command of the sheriff's public relations division. From the point of view of an outsider, Tenwolde's activities would probably appear to be part of his normal employment responsibilities. If the rape of an arrested female can be construed as within the scope of employment, surely Tenwolde's much more job-related efforts to induce Chief Justice Rose Bird's resignation could be construed (at least in terms of a question of fact for jury determination) to be potentially within the scope of his employment.

*Public Policy Considerations*

Does this analysis end our discussion? We think not. Determining that a third party, if injured by Tenwolde's lobbying activities, could have sought compensation from the County, does not provide the complete answer to Tenwolde's efforts to seek indemnity. This was not a case of injury to a third party. It was, instead, an action to block illegal activities by a public agency. The injury resulting from the illegal activity was an injury to the public itself. The title to the article here under discussion is "Indemnification of Public Employees." (Gov. Code, tit. I, div. 3.6, art. IV.) While the text of the statutes in question does not use the word "indemnification," it is clear that this is the principle with which we deal. Granted, these indemnification provisions are statutory, and hence common law concepts are not necessarily applicable. However, indemnification is typically a tripartite concept, resting upon equitable principles. Ordinarily, it is the right of one who has satisfied another's debt to a third party to recover from the principal obligor. (See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 167, p. 847.) It makes no sense to talk about indemnification of a claim upon an indemnitee when the claim arises from damage by the indemnitee to the indemnitor. Here the wrong giving rise to the expenditure of fees and costs was an illegal expenditure of County funds—a tort by the sheriff's lieutenant against his own employer. When the party committing the wrong is stopped, and then assessed costs and fees, it would not be logical, and certainly would not accord with equitable principles, to require the wronged party, the County, to reimburse the employee.

It may be helpful in this analysis to consider the nature of the plaintiff in the action. Section 3206, found breached in this case, forbids employee on-duty participation in political activities. This restriction was imposed by the Legislature with the preamble, contained in section 3201, that "The Legislature finds that political activities of public employees are of significant statewide concern," and that the provisions of the new chapter "shall supersede all provisions on this subject in the general law of this state or any . . . county . . . ."

Although no specific provision for enforcement is included in the chapter, it seems obvious that as a law of general statewide application its enforceability lies with appropriate governmental law enforcement entities. While the County counsel may in this case have been thought to have a conflict of interest (having been solicited to represent the sheriff and declined), the Attorney General did not. The Attorney General is the public entity generally authorized to enforce laws of the state. (*People* ex rel. *Lynch* v. *San Diego Unified School Dist.* (1971) 19 Cal.App.3d 252, 258 [96 Cal.Rptr. 658].) The Attorney General would have been a proper party plaintiff in this case, brought to restrain illegal activities by the sheriff's department. Indeed, as a precursor to their lawsuit the plaintiffs requested that the Attorney General take action, which he declined to do. *However*, had the action been brought by the Attorney General, with the resulting halt in the sheriff's political activities, and had thereafter costs been assessed against Tenwolde, would there have been any question about the denial of reimbursement of those costs from the very entity sought to be protected by the lawsuit? We think not.

It should make no difference that the plaintiffs in the lawsuit were "taxpayers." ■ Taxpayers are authorized under Code of Civil Procedure section 526a to bring an action against governmental officers to enjoin the waste or illegal expenditure of government funds. The taxpayer in such case acts as substitute for the otherwise responsible governmental law enforcement agency.[5] In harmony with this theory is the requirement that as a prerequisite to the suit a demand must be made upon the appropriate

[5]The argument supporting this concept is set forth in *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 44 [141 Cal.Rptr. 315, 569 P.2d 1303], as follows: "In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of

officials. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 134, p. 165; *Hansen* v. *Carr* (1925) 73 Cal.App. 511, 514 [238 P. 1048]; *Schaefer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 293 [295 P.2d 113].) The remedy resulting from such suit is not an award or order in favor of the taxpayers. In fact, there is no requirement of any showing that the illegal governmental activities have damaged the plaintiff taxpayers to any greater extent than other citizens. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) The award or order is for the benefit of the governmental entity and its citizens. ██ When, then, a cost award including fees based on the "private attorney general doctrine" is made, it would turn the objective of the suit on its head to require indemnification of the judgment by the very governmental agency the suit sought to benefit.

Of assistance in our deliberations is *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]. At issue in that case was the propriety of expenditure of funds of the California Department of Parks and Recreation to promote the passage of a bond issue. After deciding that the expenditure was unauthorized, the court wrestled with the question of the personal liability of William Penn Mott, Jr., the director, for reimbursement of the improperly spent moneys. The court noted that under section 825 et seq. a public employee who imposes liability on his governmental agency through his torts is precluded indemnification " '. . . only in the rare instances of injuries arising from acts either outside the scope of employment or performed with actual fraud, corruption or malice.' " (*Stanson* v. *Mott, supra,* at p. 225, quoting *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 792 [73 Cal.Rptr. 240, 447 P.2d 352].) Admitting that the indemnification statutes were not directly in point in the case, the court nonetheless considered that their "provisions do reflect a general state policy to limit a public employee's personal financial responsibility for errors committed in the course of his public employment." (*Stanson* v. *Mott, supra,* at p. 225.) The ultimate conclusion of the court, based not upon any specific statute but upon general equitable grounds, was that "public officials must use 'due care,' i.e., reasonable diligence, in authorizing the expenditure of public funds, and may be subject to personal liability for improper expenditures made in the absence of such due care." (*Id.* at pp. 226-227, fn. omitted.)

We recognize that the question put to the court in *Stanson* v. *Mott, supra,* is not the same as the question we face. Mott was not seeking indemnification for a judgment he had to pay for misappropriation of funds, rather he was attempting to avoid the personal judgment altogether. Nevertheless, the

representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of 'public interest' law firms funded by public and foundation monies . . . has it been possible to secure representation on any large scale. . . ."

case is instructive. It suggests that Tenwolde at some point in the prior proceedings should have interposed a defense of good faith expenditure of time and money, done with due care and lack of any negligence, and in the absence of knowledge of any illegality.

The difficulty with this potential defense is that it is now too late to raise. By imposing the cost and fee judgment against Tenwolde (and Duffy too, of course) the trial court impliedly made the finding required by the *Stanson* v. *Mott* court. To have imposed the judgment on Tenwolde without having found him either intentionally or negligently at fault would have been at odds with the rule of *Stanson* v. *Mott*. That judgment is now final. Any contention of lack of liability based on *Stanson* v. *Mott* should have been raised in the trial court, or at all events in the appeal that followed. Tenwolde's liability is established and now final. In that the decision affirming liability by law must have been based upon a finding of negligence, *Stanson* v. *Mott* stands for the proposition that Tenwolde is personally liable for the judgment. As we have indicated above, it would confound general principles of equity now to shift that burden back to the very entity the whole litigation sought to protect.

### DISPOSITION

The judgment is reversed. In light of the tedious history of this case, in which escalating costs have cumulated to reach a substantial judgment, each side shall bear its own costs on appeal.

Benke, Acting P. J., and Nares, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 10, 1993. Kennard, J., was of the opinion that the petition should be granted.