[No. E008993. Fourth Dist., Div. Two. Dec. 14, 1993.]

RAY HENRIKSEN, Cross-complainant and Appellant, v.
CITY OF RIALTO, Cross-defendant and Respondent.

**COUNSEL**

Sprague, Tomlinson & Nydam and Kenneth W. Nydam for Cross-complainant and Appellant.

Cotkin, Collins & Franscell, Jeffrey L. Garland, Franscell, Strickland, Roberts & Lawrence, Tracy Strickland and S. Frank Harrell for Cross-defendant and Respondent.

**OPINION**

**RAMIREZ, P. J.**—Ray Henriksen appeals from the trial court's grant of summary judgment in favor of the City of Rialto (hereinafter Rialto) on his cross-complaint arising out of an accidental injury inflicted by Henriksen, an off-duty police officer, on another off-duty officer. Appellant argues that Rialto was obligated as a matter of law to indemnify him for any damages recovered against him. We agree with the trial court and we affirm.

## FACTS

On January 29, 1989, Chris Masotto filed suit against appellant Ray Henriksen and Rialto to recover damages for injuries Masotto suffered on March 26, 1988, when the service revolver in the possession of appellant Henriksen accidentally discharged and wounded Masotto. In his complaint Masotto set forth two theories of negligence against Rialto: first, that the city negligently failed adequately to screen applicants for police positions and that it hired and gave a weapon to Henriksen who was unsuitable and who negligently used the weapon in such a manner as to inflict a gunshot wound upon plaintiff; and, second, that the city failed adequately to train and supervise Henriksen.[1]

Rialto answered the complaint denying liability. Henriksen also filed an answer in which he denied liability and stated that he was employed by Rialto, that he was acting within the course and scope of his employment at the time the injury occurred, and that if he was found to be negligent Rialto should be held responsible under the doctrine of respondeat superior.

At that same time Henriksen filed a cross-complaint against Rialto for indemnification for any damages awarded against Henriksen and for the costs of his defense. Rialto denied the allegations in the cross-complaint and then filed a motion for summary judgment on the cross-complaint. As the basis for the motion Rialto argued that, under Government Code section 995.2, Rialto was not obligated to provide a defense to the civil action brought against Henriksen if Rialto determined that the act or omission complained of was "not within the scope of [Henriksen's] employment . . . ." Similarly, under Government Code section 825, subdivision (a), Rialto would be required to indemnify Henriksen for judgment entered against him only if the judgment was based on "an injury arising out of an act or omission occurring within the scope of his employment . . . ."

Rialto argued that under the uncontroverted facts of the case as established at the deposition of Henriksen, the actions which served as the basis for the complaint against Henriksen were, as a matter of law, not within the scope of Henriksen's employment as a police officer.

Declaration and deposition testimony of Henriksen established that at the time of the incident Henriksen was employed by Rialto in the police

---

[1]We note that although Henriksen was named in the complaint, no causes of action were alleged against Henriksen as an individual.

department and had been assigned as a supervising sergeant with the department for approximately three years. One of his functions was to be in charge of firearms training.

On the evening of March 25, 1988, Henriksen concluded his shift at approximately 11:30 p.m. A short time later Henriksen and another officer arranged to meet at a local establishment called the B & B Rancho. Before going to the B & B Rancho Henriksen took off his gun belt and radio and put on a tan cover-up windbreaker over his uniform shirt. Henriksen acknowledged that under written department rules, an off-duty officer was required to remove not only the gun belt but also the uniform shirt worn by that officer.

Henriksen stated his belief that there was a written department policy which encouraged off-duty officers to carry their service weapons although no such written policy is included in the record in this appeal. Upon leaving the police station Henriksen placed his service weapon, a .45-caliber automatic pistol, in his waistband. Henriksen arrived at the B & B Rancho sometime before midnight where he socialized with other officers and with plaintiff Chris Masotto until the B & B Rancho closed about 1 a.m. on March 26. Henriksen stated that he had been drinking light beer at the B & B Rancho and he believed that he had consumed three beers during the time he was there. He stated that he did not consider himself intoxicated at the time he left the B & B Rancho, and that he did not easily become intoxicated.

When the B & B Rancho was about to close, Henriksen and others agreed to chip in some money to buy beer and to meet again at the house of plaintiff Masotto. Henriksen drove the few blocks to Masotto's house, arriving just after Masotto but before Masotto had entered his house. Henriksen and Masotto had been friends and had socialized together for many years. As Henriksen was walking through the front yard of Masotto's house he began to move his gun from his waistband where it had slid down and had become uncomfortable. Masotto was walking ahead of him. As Henriksen moved his gun, it discharged, wounding Masotto in the arm.

Following a brief hearing the trial court granted the summary judgment motion of Rialto and judgment was entered in favor of the cross-defendant in that proceeding. In its minute order the court stated: "The Court finds that there is no triable issue as to any material fact. Specifically it is found that Cross defendant Hendrickson [*sic*] was not acting within the scope of his employment." Cross-complainant Henriksen filed this appeal.

## Discussion

■■■ On appeal Henriksen does not contend that there are disputed issues of material fact; the sole issue raised in this appeal is whether the trial court correctly ruled, as a matter of law, that Henriksen was not acting within the scope of his employment at the time Masotto was injured.[2]

■ "Whether a tort was committed within the scope of employment is ordinarily a question of fact; it becomes a question of law, however, where the undisputed facts would not support an inference that the employee was acting within the scope of his employment. [Citation.]" (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948].)

■ Henriksen argues that California law imposes on police officers an obligation to act in emergency situations whether on or off duty and imposes a penalty for failure to do so. (Pen. Code, §§ 410, 142, 726.) Another provision of the law "exempts police officers from the prohibition on carrying loaded firearms." (Pen. Code, § 12031.) Henriksen concludes that

---

[2]The dissent charges that the majority has failed to approach the review of grant of a motion for summary judgment under the appropriate procedural rules, and that we should first have addressed the issue of whether there existed any triable issues of material fact.

In our view the obligation to raise and identify triable issues of material fact lies with the parties to the action and is not the responsibility of the appellate court. "It is the duty of appellants' counsel, not of the courts, 'by argument and the citation of authorities to show that the claimed error exists.' [Citation.]" (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69].) In the present case appellant argues that the trial court's error consisted of an erroneous ruling on an issue of law; appellant does not contend that there existed triable issues of material fact. We have accepted the case as presented by appellant and have addressed the issue raised by him.

The dissent further contends that the majority has failed to distinguish between the doctrine of respondeat superior and the indemnification statutes under which the trial court was asked to rule. (See dis. opn., *post*, at p. 1623.) We recognize that under respondeat superior an employer may be held directly liable for the acts of an employee under a theory of vicarious liability, while under the statutes at issue in this case an employer may be required to indemnify an employee for a judgment arising out of the employee's acts; the two doctrines are conceptually and procedurally distinct.

In the present case, however, the similarities between the two doctrines are more significant than the differences. "Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208 [285 Cal.Rptr. 99, 814 P.2d 1341].)

As we have stated, the same issue is central to the analysis of the obligation of a government entity to provide a defense for and to indemnify an employee under Government Code sections 995 and 825: The critical issue under the indemnification statutes is whether the employee's actions, which resulted in the injury for which the indemnification is sought, occurred within the scope of employment. Although the analysis of "scope of employment" in the majority opinion relies primarily on cases decided under a theory of respondeat superior, the analysis is equally applicable to the indemnification issue before us in this appeal.

since Rialto expected the loaded weapon to be on his person, Rialto is responsible under the doctrine of respondeat superior for the accidental discharge.

The California Supreme Court has recently considered the doctrine of respondeat superior in the context of abuse of authority by an on-duty police officer. (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d 202.) The court there held the city liable for a rape committed by a police officer while on duty. Despite the factual differences between that case and the one before us, the court's analysis in that case is instructive here.

The court reviewed the doctrine of respondeat superior: ■ "Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment. [Citation.] . . . The doctrine is a departure from the general tort principle that liability is based on fault. [Citation.] It is ' "a rule of policy, a deliberate allocation of a risk." ' [Citations.] Respondeat superior is based on ' "a deeply rooted sentiment" ' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities. [Citations.]" (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 208.)

Having recognized the policy underpinnings of the doctrine, the court then articulated three policy reasons for imposing liability under the doctrine: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. [Citation.]" (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 209.)

■ The court went on to state that "For the doctrine of respondeat superior to apply, the plaintiff must prove that the employee's tortious conduct was committed within the scope of employment. [Citation.] 'A risk arises out of the employment when "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer. [Citation.]" ' " (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 209.)

A review of significant cases in which employers have been held liable under the doctrine of respondeat superior reveals a number of variables

which are evaluated by courts in reaching their decisions. In *Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d 202, the court held the city liable for a rape committed by an on-duty police officer who stopped the plaintiff for erratic driving, gave her a field sobriety test, then drove her to her house and forcibly raped her. (*Id.,* at p. 207.) The court acknowledged that the rape was a specific violation of official duties and did not in any way benefit the city, but nonetheless held the city vicariously liable after it determined that the offense was within a series of acts that were authorized by the employer and that it was accomplished by using the authority the officer had as a result of his employment. (*Id.,* at pp. 218, 219.)

In *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962 [227 Cal.Rptr. 106, 719 P.2d 676], the court found the defendant employer vicariously liable for injuries received by plaintiff when he fell off the back of a disking machine being run by one of the defendant's employees notwithstanding the fact that the employee had been told not to let anyone ride on the machine. The court concluded that "As long as it is clear that at the time of the injury the employee was following his employer's instructions to disk the orchard, the fact that he was not authorized to take a passenger is immaterial." (*Id.,* at p. 969.)

Liability has not been limited to situations in which an employee was on duty at the time the injury occurred. In *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608 [124 Cal.Rptr. 143], liability was found under respondeat superior for injuries inflicted by off-duty employees of defendant construction company in the course of a fight. The evidence showed that the employees had been drinking alcohol after hours on the defendant's jobsite and with the tacit approval of defendant's supervisors, that the participants in the fight had not known each other prior to the employment relationship, and that ". . . the dispute which was the proximate cause of the assault arose out of the employment." (*Id.,* at pp. 621-622.)

In *Childers* v. *Shasta Livestock Auction Yard, Inc.* (1987) 190 Cal.App.3d 792 [235 Cal.Rptr. 641], the court determined that an after-hours automobile accident occurred in the scope of employment once it was established that the employee who drove the car off the road had been drinking beer and hard liquor provided by the employer and on the employer's auction yard. The court agreed with plaintiff's contentions that the negligent employee "consumed alcohol in the scope of her employment, that [her] consumption created a risk of danger, and that the risk was a proximate cause of the accident and of plaintiff's injuries, so that [defendant] is properly liable . . . ." (*Id.,* at pp. 802-803.)

The case before us contains none of the factors deemed critical in the cited cases: the incident did not occur during working hours, was not accomplished by use of Henriksen's authority as a police officer, did not occur in

the course of acts that Henriksen was carrying out under his employer's instructions or on his employer's behalf. The injury to Masotto did not occur after Henriksen had drunk alcohol provided by the employer or permitted by the employer on the employer's premises. Even the relationship between Henriksen and Masotto predated Henriksen's employment by many years and did not arise out of the employment relationship.

The only factor which would weigh in favor of the imposition of vicarious liability in the present case is the fact that Henriksen was carrying a gun which had been issued to him by his employer and which he was authorized to carry when he was off duty so that it would be available for his use in emergency situations.

Henriksen argues that the risk of harm in the present case was the risk associated with carrying a weapon, and that, since Rialto stood to benefit from the fact that Henriksen had the gun available for emergency use, Rialto should also bear the risk of harm resulting from the presence of the gun. We recognize the social benefit which may follow from having armed and trained police officers in the community during their off-duty hours. However, we do not agree with Henriksen's conclusion that any harm resulting from his possession of the weapon must therefore be borne by Rialto.

The risk which existed in the present case was the risk inherent in having an officer carry a gun while engaged in activities other than active law enforcement. In an effort to minimize that risk Rialto provided special weapons training to its police officers so that they would know how to handle their weapons both on and off duty.

The question presented here is, to the extent the risk of harm could not be eliminated, who should bear the cost of the risk and any resulting injury? In our opinion a weapon should be treated like another potentially dangerous instrumentality, the automobile. Decisions construing the scope of employment in automobile accident cases involving government employees have held that in order to hold the employer liable, the employee must be driving the automobile on employer business and not for the employee's own benefit. (See *Brindamour* v. *Murray* (1936) 7 Cal.2d 73 [59 P.2d 1009] [city not liable for injuries resulting from negligent driving of city car by police captain who was involved in accident as he drove home with his wife from dinner]; cf. *Megowan* v. *City of Los Angeles* (1936) 7 Cal.2d 80 [59 P.2d 1012] [use of city-owned vehicle to drive president of the board of fire commissioners on inspection tour was authorized municipal purpose permitting recovery against city for injuries inflicted in car accident involving city employee who was on his way to pick up commissioner].)

We believe that those decisions appropriately delineate the scope of employment of a police officer who is carrying a weapon while he is off duty. As with automobiles, when weapons are used for law enforcement purposes, liability for harm which results would properly extend to the employer. The mere presence of the weapon, however, without more is not sufficient to impose liability on the employer for all of the employee's actions. We conclude that in the present case Henriksen was not acting within the scope of employment at the time of Masotto's injuries.

Having reached that conclusion, we must still consider the policy factors enumerated above to see whether they would compel a different result under the facts presented.

The first of the policy objectives identified by the court in *Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d 202, is "to prevent recurrence of the tortious conduct." (*Id.* at pp. 214-215.) In the present case that factor would argue against imposition of liability on Rialto. Requiring Rialto to indemnify Henriksen might help to prevent recurrence of the conduct complained of if it induced Rialto to reverse its policy of permitting off-duty officers to carry loaded weapons. The negative impact of such a policy would be apparent because off-duty officers would be unable to appropriately respond to emergencies. Furthermore, requiring indemnification would provide no incentive to the off-duty officers to take more care in handling their weapons in casual social situations. Requiring Rialto to indemnify Henriksen might have the effect of improving officer training in handling of weapons to minimize incidents such as the one before us, but in view of Henriksen's status as officer in charge of firearms training it is unlikely that further training would have altered the result in the present case.

The second policy reason cited by the Supreme Court was "to give greater assurance of compensation for the victim." That factor is particularly inapplicable to the case before us because the question of compensating the victim is not directly presented in this appeal; the issue is only one of indemnification of an individual who might be held liable for the injury. The relationship between indemnification of Henriksen and compensation to Masotto is one on which we can only speculate, and we decline to do so.

The final policy consideration is "the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise." (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 216.) We have discussed the nature of the risk in the present case and the fact that Rialto, by training its officers, has taken steps to reduce the risk of harm. Moreover, the risk in the present case was substantially altered by Henriksen's activities once he was no longer on

duty, in particular by his consumption of alcohol. In *Childers* v. *Shasta Livestock Auction Yard, Inc., supra,* 190 Cal.App.3d 792, and *Rodgers* v. *Kemper Constr. Co., supra,* 50 Cal.App.3d 608, the consumption of alcohol was identified as a significant fact bearing on the nature of the risk and the finding of liability. The unpredictable consequences of alcohol consumption necessarily changed the evaluation of whether "in the context of the particular enterprise an employee's conduct is . . . so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." (*Rodgers* v. *Kemper Constr. Co., supra,* 50 Cal.App.3d at p. 619.)

In those cases, consumption of alcohol which was condoned by the employer led to consequences which were deemed to be "foreseeable" by the employer. In the present case consumption of alcohol changed the nature of the risk facing Rialto in permitting its off-duty officers to carry their weapons. To require indemnification in the present case would place Rialto in the position of assuming an unacceptable risk of liability for the actions of its off-duty officers.

In our view, the enhanced risk was not one which should be borne by the public. The officers themselves, when they make the decision to socialize after hours, are the ones in a position to take the necessary safeguards to mitigate any increased risk; if they fail to do so they, not the public, must bear the loss.

We conclude that the trial court correctly determined, under the facts presented here and accepted by the parties, that Henriksen was not acting within the scope of his employment, and we affirm.

### DISPOSITION

The summary judgment entered in favor of cross-defendant and respondent City of Rialto is affirmed. Costs on appeal to be borne by cross-complainant and appellant Henriksen.

Dabney, J., concurred.

**TIMLIN, J.**—I respectfully dissent.

### I

### INTRODUCTION

The issue here is simple: did Rialto, as the moving party on a motion for summary judgment (motion) and despite the contents of Henriksen's opposition to that motion, establish, as a matter of law, that Henriksen was not

acting within the scope of his employment by Rialto at the time Henriksen's service pistol discharged and the round hit Masotto, so as to defeat Henriksen's cross-complaint for indemnification, apportionment of fault, declaratory relief and breach of contract against Rialto?

In my opinion, Rialto did not. Henriksen's opposition to the motion raised triable issues of material fact because it contained evidence that:

(1) Rialto encouraged its police officers to carry guns while "off duty" or "off shift,"

(2) Rialto specified the type and caliber of weapon which could be carried while "off duty" or "off shift,"

(3) Rialto expected its police officers to perform law enforcement activities as the need might arise even while they were "off duty" or "off shift,"

(4) Rialto had specifically authorized Henriksen to carry his city-purchased service weapon as his "off duty" weapon,

(5) Henriksen was carrying that weapon at the time of its discharge because he was a police officer and expected to carry it, and,

(6) Henriksen's only authority for carrying the weapon was his status as a police officer.

These facts were material because they were directly related to the issue of what constituted the scope of Henriksen's employment.

Thus, because triable issues of material fact remained to be resolved on the issue of whether Henriksen was acting within the scope of his employment at the time the pistol fired, the trial court should have denied Rialto's motion.

Unfortunately, the majority has chosen to ignore the procedural rules which must be adhered to on review of a judgment following an order granting a motion for summary judgment. (See maj. opn., *ante*, at p. 1617, fn. 2.) Further, the majority also assumes that certain facts have been established as uncontroverted, even though such facts were not raised by the parties as material to the issue presented, let alone having been suggested to be uncontroverted.[1] Finally, the majority fails to differentiate between the doctrine of respondeat superior and the statutory scheme, as set forth in the California Torts Claims Act (Gov. Code, § 810 et seq.), which scheme (a)

---

[1]For example, neither party asserted undisputed material facts on the issue of the extent of alcohol consumption by Henriksen from the time he went "off duty" until the time of the

prevents public entity employers, except in certain specified circumstances, from seeking indemnification from public employees after paying claims based on such employees' tortious acts or omissions which occurred within the scope of employment, and (b) requires public entity employers to provide or pay for the cost of a defense for such employees in connection with such claims and to indemnify them as to any judgment against them based on such claims.

## II

## DISCUSSION

### A. *Scope of Review of Summary Judgments*

Because this is an appeal from a judgment entered following an order granting Rialto's motion, we are bound, on review, to adhere to the rules related to appellate review of orders granting or denying summary judgment motions:

"Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. [Citations.] First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.]

"Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] The motion must stand self-sufficient and cannot succeed because the opposition is weak. [Citations.]" (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

When, as here, the defendant is the moving party, the defendant need only negate one element of a cause of action, or establish that there is a complete defense to it. It need not disprove every element of the cause of action nor every theory set forth in the complaint. (Code Civ. Proc., 437c, subd. (n)(2), as amended by Stats. 1992, ch. 1348, § 1.)

"When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the

---

weapon discharge, and the issue of the nature and extent of the weapons training provided by Rialto to its police officers. This point will be further discussed in part F., *post*.

existence of a triable, material factual issue. [Citation.] Counteraffidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue. [Citations.] A court generally cannot resolve questions about a declarant's credibility in a summary judgment proceeding [citations], unless admissions against interest have been made which justify disregard of any dissimulation. [Citation.] A sufficient motion cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings. [Citations.]" (*AARTS Productions, Inc.* v. *Crocker National Bank, supra,* 179 Cal.App.3d 1061, 1065.)

In other words, ". . . we are required to reassess the legal significance and effect of the papers presented by the parties in connection with the motion" and "thus must apply the same three-step analysis required of the trial court . . . . [¶] In practical effect, we assume the role of a trial court and redetermine the merits of the motion. In doing so, we must rigidly scrutinize the moving parties' papers. [Citations.]" (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548-549 [5 Cal.Rptr.2d 674]; see also this court's opinion in *Schrader* v. *Scott* (1992) 8 Cal.App.4th 1679, 1683-1684 [11 Cal.Rptr.2d 433], adopting the independent review standard whereby ". . . the appellate court undertakes an independent review of the evidence presented to the trial court to determine whether no triable issues of fact were presented. [Citation.]" (*Id.,* at p. 1683.))

The majority attempts to avoid this requirement of an independent review of the moving and opposing papers by citing *Sprague* v. *Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69] for the proposition that because Henriksen does not contend on appeal that there were triable issues of material fact, it need not consider such issue, but that instead it need only "address[] the issue raised by him." (Maj. opn., *ante,* p. 1617, fn. 2.)

There are two problems with the majority's position. First, *Sprague* v. *Equifax, Inc.* is inapplicable in this situation.

In *Sprague* v. *Equifax, Inc.,* the appellants contended that the trial court had improperly refused to give certain jury instructions. However, they made no attempt to argue the applicability of the refused instructions to the facts of their particular case, nor did they cite any authority for giving such instructions in such a case. Likewise, they failed to demonstrate how the failure to give the requested instructions could have prejudiced them.

The appellate court held that a reviewing court is not " 'required to make an independent, unassisted study of the record in search of error or grounds

to support the judgment,'" and that "'[a]ccordingly, every brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' [Citation.]" (166 Cal.App.3d at p. 1050.) In other words, although the appellants had raised the issue of the propriety of the jury instructions, they had failed to support that issue with a cite to authority or argument.

*Sprague* v. *Equifax, Inc.* thus stands for the simple proposition that a point raised on appeal must be supported by citation to authority and/or argument; it does not stand for the proposition that a reviewing court, faced with a challenge to an order granting summary judgment, may avoid an independent review of the moving and opposing papers.

The second problem with the majority's attempt to sidestep the appropriate scope of review is its assumption that the issue raised is whether Henriksen is entitled, as a matter of law, to a judgment in his favor that Rialto is obligated to indemnify him. (Maj. opn., *ante*, at p. 1614.) It is true that Henriksen has asked that this court enter judgment in his favor on the cross-complaint, as a matter of law, and I agree with the majority that he is not entitled to such a judgment, although my reason for reaching this conclusion is both procedural and substantive. However, although Henriksen asked us to enter judgment in his favor, he *also* asked us to reverse the summary judgment in favor of Rialto, and he, unlike the appellants in *Sprague* v. *Equifax, Inc.*, has supported this request with argument and with citation to authority.

True, Henriksen has not used the magic phrase "triable issue of material fact" in making his argument that the judgment must be reversed because of Rialto's alleged policies as to the off-shift or off-duty police officers carrying their service weapons. However, he does argue that the assumed existence of that policy demonstrates that he was, in fact, acting within the scope of his employment at the time of the weapon discharge, and he supports that argument with various citations to authority. In my opinion, this argument is sufficient to require this court to apply the above noted rules of appellate review of the granting of a summary judgment.

B. *Issues Presented by the Cross-complaint and Answer Thereto; Facts Asserted to Be Material and Disputed or Undisputed in This Case*

Henriksen and Rialto were both sued by Masotto for "general negligence." Masotto alleged that the "CITY OF RIALTO and its Police Department" negligently caused his injury and damages as follows:

"Defendants negligently and carelessly failed to adequately screen applicants for positions with its police department and ultimately hired and gave a badge and weapon to defendant RAY HENDRICKSON [sic]."

"Said individual was unsuitable for said position as a police officer and did use said badge and weapon in a negligent fashion so as to inflict a gunshot wound upon the person of the plaintiff."

Masotto further alleged, apparently as a separate cause of action, that:

"Defendants did negligently and carelessly fail to adequately train and supervise officer RAY HENDRICKSON [sic] so as to proximately cause and allow him to use his badge and weapon in an unsafe manner.

"As a direct and proximate result of the actions of defendant, and each of them, plaintiff did suffer and continues to suffer, extreme mental and physical anguish and pain."

Henriksen's cross-complaint contained four causes of action:

(1) for indemnification, which cause of action alleged that "cross-defendants" were acting within the scope of their employment, and that if he were found to be liable for the plaintiff's injuries, his liability would be based not on his own conduct, but on a derivative form of liability imposed upon him by law, which would thus entitle him to complete indemnification from "cross-defendants";[2]

(2) for apportionment of fault;

(3) for declaratory relief that he was entitled to indemnification and a defense from Rialto because, at the time of the gun discharge, he was employed by the City of Rialto and was acting within the scope of his employment; and

(4) for breach of a contract (the oral or written nature of which contract was not alleged) between Henriksen and Rialto which provided that Rialto would indemnify and defend him as to any causes of action brought against him as a result of any activity by him occurring during the scope of his employment.

---

[2]These allegations are those which could be made by an *employer* who might be held to be vicariously liable for the tort of an *employee* committed within the course and scope of the employee's employment. Such an employer may, unless otherwise prevented from doing so (as by Gov. Code, § 825.4, 996), bring an action for indemnification against the employee. (See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 61 at pp. 67-68.)

Henriksen's answer to Masotto's complaint[3] alleged that at the time of the acts alleged in the complaint, Henriksen was employed by the City of Rialto and was acting within the scope of his employment so that "if he's found to be negligent, the employer is responsible in his stead under the doctrine of respondeat superior."[4]

Rialto answered the cross-complaint with a general denial, and raised as affirmative defenses (1) Henriksen's failure to state facts sufficient to constitute a cause of action; (2) Henriksen's contributory negligence; and (3) Henriksen's failure to file a timely claim.

Rialto thereafter filed its motion for summary judgment or alternatively summary adjudication of issues as to Henriksen's cross-complaint on the theory that Henriksen, as a matter of law, had not been acting within the scope of his employment by Rialto at the time the service pistol discharged.

In connection with its motion, Rialto listed as undisputed the following material facts:

"1. At approximately 11:30 p.m. on March 25, 1988, HENRIKSEN went 'off duty' as a RIALTO police officer.

"2. After going 'off duty,' HENRIKSEN drove his car to a local bar called the 'B&B Rancho.'

"3. HENRIKSEN arrived at the B&B at approximately 12:00 midnight with his RIALTO service revolver tucked in his waistband. At the B&B, HENRIKSEN began socializing with CHRIS MASOTTO.

"4. HENRIKSEN and MASOTTO were then joined by at least three other individuals: Mike Scroggins, Tim Lane and Jeff Stotes. HENRIKSEN and MASOTTO socialized until approximately 1:00 a.m. when the B&B announced its 'last call' and closed for the evening.

"5. HENRIKSEN and MASOTTO AGREED TO RESUME THEIR SOCIALIZING AT MASOTTO's residence. Scroggins, Lane and 'a couple of other fellows' agreed to join MASOTTO and HENRIKSEN.

---

[3]Henriksen's answer erroneously states in the title or caption that it is the answer to the "cross-complaint of Ray Hendrickson [sic]."

[4]Henriksen raised the doctrine of respondeat superior in his answer to the complaint but not in his cross-complaint, the pleading here at issue. Henriksen, in his cross-complaint, asserted a specific right to indemnification rather than relying on "respondeat superior." Thus, to the extent Henriksen's opening brief implies in passing that the doctrine of respondeat superior, rather than Government Code sections 995 and 996.4 on which he predominantly relies, supports his action for indemnification, it is wrong.

"6. MASOTTO and HENRIKSEN subsequently arrived at MASOTTO'S residence. While MASOTTO walked toward his front door, HENRIKSEN began adjusting his revolver. According to HENRIKSEN, the weapon discharged and MASOTTO was struck in the arm."

Rialto asked the lower court to (1) "adjudicate" these facts as existing as a matter of law, (2) conclude, as a matter of law based on such facts, that Henriksen was not acting within the scope of his employment at the time the service pistol fired, and (3) grant its motion based on such conclusion and dismiss Henriksen's cross-complaint with prejudice.

In opposition to this motion, Henriksen filed a "separate statement" in which he responded to Rialto's undisputed material fact No. 1 that he had gone "off duty" before the shooting, by stating:

"Henriksen was a full time employee of the City of Rialto as a police officer and was, therefore, a police [sic] at all times and had merely a designated shift."

In response to Rialto's undisputed material fact No. 6, Henriksen stated, in relevant part:

"[Henriksen's] service weapon, which he carried during his shift, was specifically authorized by the Rialto Police Department to be his 'off duty' weapon. The Rialto Police Department encouraged all of its officers to carry a weapon off duty and their general orders authorized the carrying of weapons 'off duty' as the police officers were expected to perform their duties as a police officer even while not on a specific assigned shift. Rialto Police officers were subject to discipline for their activities while not on a specific shift and are at all times police officers whether actually paid or functioning between shifts. . . . Further, Henriksen's functions as a police officer with the City of Rialto was to be the armorer, the range master, and in charge of firearms training. He is aware of the policy of the Rialto Police Department in connection with carrying weapons while on shift and off shift and is aware that the Department encourages officers to carry weapons while 'off duty' and, further, that the Department has set forth a policy of which type and caliber weapons are authorized to be carried while 'off duty.' . . . At the time of the incident alleged by Masotto, Officer Henriksen . . . was carrying his service weapon. His only purpose in having the weapon was because he was a police officer, expected to carry this weapon. His only authority for having the weapon was pursuant to his assigned duties as a police officer. . . ."

The record does not contain a reply by Rialto to Henriksen's opposition. However, the transcript of the hearing on the motion indicates that, for all

intents and purposes, Rialto took the position that, even assuming the evidence produced by Henriksen was true, and that Rialto required its officers to perform law enforcement activities while "off duty" and encouraged them to carry their weapons for this reason, nonetheless, as a matter of law, the gun firing did not occur within the scope of Henriksen's employment because he was off on a private "frolic" by attending a private party, and that Rialto would only be responsible if Henriksen had used his gun while actively carrying out a law enforcement activity.[5]

At the end of the hearing, the trial court asked the parties to submit supplemental briefing on the issue of whether "the requirement of carrying a gun constitutes being responsible for all the consequences that flow from having a gun."

Henriksen submitted a brief which discussed three out-of-state cases involving negligent and intentional shootings by "off duty" police officers which cases purportedly supported his position. He also cites these cases on appeal but none of the three out-of-state cases is directly on point, because they do not *specifically* address the critical legal issue here: whether a police officer who is required to perform as a peace officer at all times, even when "off duty," and who is encouraged or required by her or his employer to carry his or her weapon for that purpose, is acting within the scope of his or her employment when, while "off duty," the weapon is accidentally discharged.

At best, one of the cases can be read to *assume* that such officers are acting within the scope of employment. In *Moore* v. *City of Detroit* (1983) 128 Mich.App. 491 [340 N.W.2d 640], the appellate court held that although the plaintiff, an innocent bystander who was shot by an "off duty" police officer during the officer's confrontation with an armed robber, had established a prima facie case that the city's policy might have resulted in his injuries, the city could not be held liable for its *employee's* negligence because of government immunity, nor could it be held liable under a federal civil rights statute.

The other two cases involved suits which alleged that the city itself had been negligent, rather than relying on the doctrine of respondeat superior to hold the city vicariously liable. In *Bonsignore* v. *City of New York* (2d Cir. 1983) 683 F.2d 635, after a police officer shot and seriously injured his wife

---

[5]Thus, Rialto was essentially arguing that the evidence produced by Henriksen may have created triable issues of fact, but that the evidence did not create a triable issue of *material* fact so as to preclude the granting of the motion, because the evidence was not relevant to the issue of whether Henriksen was acting within the scope of his employment.

and then killed himself, the wife sued the city for damages and for wrongful death, alleging that the city itself had been negligent in requiring her husband to carry a gun at all times while within the city limits. On appeal, the verdict in favor of the wife for the damages she had suffered because of her injuries was sustained because it was supported by evidence which showed that the city's procedures for identifying officers who should not carry weapons were deficient.

*In Peer* v. *City of Newark* (1961) 71 N.J.Super. 12 [176 A.2d 249] the plaintiff was seriously injured by a bullet from a negligently discharged gun worn by an "off duty" police officer. City regulations required the officer to carry his gun at all times except when on vacation, suspended, sick or injured. The plaintiff instituted an action against the city on the ground of *active wrongdoing by city* and won. On appeal, the judgment was affirmed, the appellate court finding that there was substantial evidence that the city had failed to provide an adequate training program in the safe use of the weapon.

Rialto submitted a supplemental brief to the trial court which urged that a police officer is only acting within the scope of employment "in narrow circumstances where 'the act was done in the prosecution of the business in which [he] was employed to assist.' [Citations.]" In its brief it argued that an employee is not acting within the scope of employment "*merely* because he is permitted or encouraged to have a weapon or other equipment on his person" and for this proposition relied on several cases, including *Alma W.* v. *Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 140 [176 Cal.Rptr. 287] and *Gipson* v. *Davis Realty Co.* (1963) 215 Cal.App.2d 190, 209 [30 Cal.Rptr. 253], which cases held that an employer could not be held liable for the acts of an employee committed while the employee was pursuing his or her own ends, even though the employee used property or facilities provided to the employee by the employer.

Rialto also argued that plaintiff's evidence in opposition was to the effect that he had been permitted to carry a gun by Rialto while "off duty" and such evidence was essentially irrelevant, given the above holdings, and that the only relevant inquiry was whether Henriksen was pursuing law enforcement activities at the time the gun discharged.

Finally, Rialto urged that public policy considerations compelled the trial court to reject Henriksen's claim of entitlement to a defense and indemnity by Rialto, because to do so would establish a "rule of municipal *strict liability* for all injuries which peace officers inflict with their weapons," including those officers who do so through intentionally tortious conduct.

The trial court concluded that Henriksen had not been acting within the scope of his employment at the time of the shooting and granted the motion. Judgment then was entered for Rialto and against Henriksen.

C. *Application of the Scope of Review to This Appeal*

Applying the general rules related to the review of judgments entered following the granting of a motion for summary judgment, which rules are set forth in part A., *ante*, it is apparent that the determination of whether there are triable issues of material fact on the critical question whether Rialto has an obligation to defend and indemnify Henriksen first depends upon the resolution of the legal question as to what is the meaning of the phrase "scope of employment" as used in the applicable Government Code sections. Once that issue has been resolved as a matter of law, the remaining question is whether Henriksen's opposition created any triable issues of material fact regarding whether Henriksen was acting within the scope of his employment at the time his service revolver discharged and Masotto was shot. If there are such issues, Rialto would not be entitled to a summary judgment on the causes of action alleged in the cross-complaint.

In considering this question, I am guided by the following statement in *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 213 [285 Cal.Rptr. 99, 814 P.2d 1341]: "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.' [Citation.] In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment. [Citations.]"

D. *The Test for Whether an Act or Omission Occurred Within the Scope of Employment*

1. *"Scope of Employment" in Respondeat Superior Cases*[6]

There is a well-established two-prong "either/or" test for whether a given act occurred within the scope of the actor's employment.

---

[6]It appears to me that the term "scope of employment" has essentially the same meaning when used in connection with a public entity's liability to the victim of a tortious act by its employee pursuant to respondeat superior as it does when used in connection with the public entity's duty to indemnify and defend the employee upon whose actions the victim's claim is based. However, even if a public employee's tortious act or omission is found to have occurred within the scope of his or her employment, the employee is not necessarily entitled to indemnification by, or to a defense provided by, the public entity.

A public employee is entitled to indemnity and a publicly paid-for defense only if the act or omission on which the claim is based occurred within the scope of the employee's

Whether an employee's tortious act was committed during the course of his or her employment will depend on whether: " '1) the act performed was *either* required or "incident to his [or her] duties" [citation], *or* 2) the employee's misconduct could be reasonably foreseen by the employer in any event [citations].' (*Clark Equipment Co.* v. *Wheat* (1979) 92 Cal.App.3d 503, 520 [154 Cal.Rptr. 874].) If an employee's actions fall within the range of actions covered by either part of this two-prong test, the employer will be liable for the wrong, even though the employee has acted maliciously and intentionally. (*Id.*, at p. 521.)" (*Alma W.* v. *Oakland Unified School Dist.*, *supra*, 123 Cal.App.3d 133, 139, italics added.)

"This [broad definition of the meaning of 'scope of employment'] is perhaps understandable in light of the fact that a principal objective of the statutes is to provide third party claimants, who have been injured by tortious acts of governmental employees, with a source of compensation. (See *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 215-216 [285 Cal.Rptr. 99, 814 P.2d 1341].) Hence, acts which clearly are not authorized by the terms of employment, and are willfully and obviously wrongful, have been held to be within the scope of employment of the governmental servant. (See, e.g., *Mary M.* v. *City of Los Angeles*, *supra* [rape of an arrested female by on-duty police officer held within the scope of employment]; *Scruggs* v. *Haynes* (1967) 252 Cal.App.2d 256 [60 Cal.Rptr. 355] [assault and battery by police officer in the course of an arrest deemed within scope of employment]; *Neal* v. *Gatlin* (1973) 35 Cal.App.3d 871 [111 Cal.Rptr. 117] [libel by members of tenure committee of state college held within scope of employment].)" (*Tenwolde* v. *County of San Diego* (1993) 14 Cal.App.4th 1083, 1091-1092 [17 Cal.Rptr.2d 789].)

### 2. *The First Prong: Act Required by or Incident to the Employee's Duties*

As to the first basis upon which it can be said that an employee was acting within the scope of his or her employment, that the act upon which the tort claim is based was required by or incident to the employee's duties:

"In assessing whether an employee's wrongful act was required by or incidental to his [or her] duties, the law defines occupational duties broadly.

---

employment *and* if the employee did not act or fail to act because of actual fraud, corruption or actual malice. (Gov. Code, §§ 825.6, 995.2.)

Thus, while a public entity could be held liable to the victim of its employee's malice- or fraud-based tort under the theory of respondeat superior, the employee would not be entitled to indemnification, and the public entity would be entitled to recover from the employee the amounts it paid to the plaintiff under such theory, assuming it had complied with the requirements of Government Code section 825.6. However, the public entity would not be entitled to seek reimbursement from an employee who was merely negligent, or who committed a tort without any malice or intent to defraud the victim of the tort.

The fact that an employee is not engaged in the ultimate object of his [or her] employment at the time of his [or her] wrongful act does not preclude attribution of liability to an employer. [Citation.] For example, acts necessary to the comfort, convenience, health and welfare of the employee while at work, though strictly personal to him[- or her] self and not acts of service, do not take him [or her] outside the scope of [the] employment. [Citation.] However, that is not to say, that employers are strictly liable for all actions of their employees during working hours. If an employee substantially deviates from his duties for personal purposes, the employer is not vicariously liable for the employee's actions. [Citations.]" (*Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d 133, 139.)

As was reiterated more recently, "For purposes of the claims statute 'a public employee is acting in the course and scope of his employment "when he is engaged in work he was employed to perform *or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences.*" [Citations.] The phrase "scope of employment" has been equated with the express or implied power of the public employee to act in a particular instance, and in evaluating his [or her] conduct to determine whether it is within the ambit of his [or her] authority we are to look *not to the nature of the act itself, but to the purpose or result intended.* [Citations.] *If the object or end to be accomplished is within the employee's express or implied authority his [or her] act is deemed to be within the scope of his [or her] employment irrespective of its wrongful nature.'* (*Neal v. Gatlin, supra,* at p. 875, fn. omitted.)" (*Tenwolde v. County of San Diego, supra,* 14 Cal.App.4th 1083, 1091-1092, italics added.)

### 3. *The Second Prong: Act Foreseeable in Light of the Duties the Employee Was Hired to Perform*

As to the second basis upon which it can be said that an employee was acting within the scope of his or her employment, that being whether the employee's act is foreseeable (*Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d at p. 139), "foreseeability," in the context of liability pursuant to respondeat superior, " 'merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Id.* at pp. 141-142, quoting *Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 619 [124 Cal.Rptr. 143]; *Jeffrey E. v. Central Baptist Church* (1988) 197 Cal.App.3d 718, 721-722 [243 Cal.Rptr. 128]; *Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1461 [232 Cal.Rptr. 685].) In other words, the foreseeability that an employee may commit a tort must be considered "*in light of the*

*duties* the employee is hired to perform. [Citation.] Thus, while it might be foreseeable for a school custodian to become involved in a dispute over the manner in which he swept the floors or cleaned a classroom and for the dispute to end in someone being hit with a mop, the same statement cannot be made with reference to rape. There is no aspect of a janitor's duties that would make sexual assault anything other than highly unusual and very startling." (*Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d at pp. 142-143; *Mary M. v. City of Los Angeles, supra,* 54 Cal.3d at p. 214; *Tenwolde v. County of San Diego, supra,* 14 Cal.App.4th 1083, 1092.)

> 4. *Application of the Scope of Employment Test to the Facts Alleged in the Motion to Be Material and Undisputed*

Here, therefore, to determine whether there is a triable issue of material fact as to whether Henriksen was acting within the scope of his employment as a Rialto police officer when his gun discharged and injured Masotto, one cannot focus exclusively on the fact that Henriksen was "off shift" (or "off duty" as Rialto describes it) at that time because, according to the evidence produced by Henriksen in opposition to the motion, even though he was "off shift" (1) he was expected to perform law enforcement activities as they might arise, (2) he was encouraged to carry his service weapon for that purpose, (3) he was authorized to carry a particular type of weapon, and no other, when "off shift," and (4) it was only his status as a police officer which caused him to carry this weapon when "off shift."

When one relates the above noted facts to the rule that an employee will be considered to be acting within the scope of employment " ' "when he is engaged in work he was employed to perform *or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences,*" ' " (*Tenwolde v. County of San Diego, supra,* 14 Cal.App.4th 1083, 1091, italics added) it is clear that the evidence produced by Henriksen creates a triable issue of material fact. Did Rialto expressly or impliedly authorize and encourage Henriksen to carry his service revolver incidental to his duties as a Rialto police officer? If so, was he so carrying it at the time it fired and the round hit Masotto? If the facts as stated by Henriksen are undisputed, then it would appear that he was acting within the scope of his employment by carrying his service weapon with him while "off shift" because he was expected to render law enforcement service when needed even while "off shift," and carrying the weapon was an aid to fulfilling this part of his duty as a police officer. Further, in light of his duties as a police officer, and if the facts noted above are undisputed, the alternative second prong of the scope of employment test applies. In my view, as a matter of law, Rialto could reasonably foresee that Henriksen

would not only be carrying the weapon but also that it might accidentally discharge and result in someone being shot.

Additionally, the fact that the weapon discharged while Henriksen was socializing and while he attempted to readjust the weapon so it could be worn more comfortably, instead of while he was actively pursuing criminals even though "off shift," does not take his carrying of the weapon, nor its accidental discharge outside the scope of his employment. To repeat, "The fact that an employee is not engaged in the ultimate object of his [or her] employment at the time of his [or her] wrongful act does not preclude attribution of liability to an employer. [Citation.] For example, acts necessary to the comfort, convenience, health, and welfare of the employee while at work, though strictly personal to him[- or her]self and not acts of service, do not take him [or her] outside the scope of [the] employment. [Citation.]" (*Alma W.* v. *Oakland Unified School Dist.*, *supra*, 123 Cal.App.3d 133, 139.)

Thus, for an employee who is expected to be "on call" at all times, the fact of engagement in the normal activities of daily life, including attending social functions and some consumption of alcoholic beverages, would not necessarily cause acts arising out of the employee's work-related duties to fall outside the scope of employment.

Furthermore, nothing in the evidence indicates as an undisputed fact that Henriksen had "substantially deviate[d] from his duties for personal purposes," so as to preclude a finding that the carrying of the pistol and its accidental discharge were, as a matter of law, outside the scope of his employment. (123 Cal.App.3d at p. 139.) For example, if Henriksen and Masotto had decided to play Russian roulette using Henriksen's service weapon, or had gone off to hunt with it, and Masotto had been injured by Henriksen's use of the weapon, then I would consider that there had been a substantial deviation or departure from Henriksen's duties as a police officer. However, given that the undisputed facts here show that Henriksen was not using the weapon for any personal purpose, but was carrying it with him solely because of his duty as a police officer to respond to criminal activity even while "off shift," it appears that there was no deviation such as would cause one to conclude that the weapon's discharge occurred while Henriksen was not acting within the scope of employment (assuming that the uncontested facts were that Rialto authorized and encouraged his carrying the pistol while "off shift").

E.   *The Majority's Creation of a Special "Scope of Employment" Test in Cases Involving Guns Carried by Police Officers as an Incident to Their Duties Is Inappropriate and Not Supported by the Majority's Analysis*

Notably, the majority, after quoting the language in *Mary M.* v. *City of Los Angeles*, *supra*, 54 Cal.3d 202, 209, as to the use of the above described test

(see maj. opn., *ante*, at p. 1618) fails to apply this test, and instead creates a new and "special" test for cases involving "off shift" police officers carrying their service revolvers, ostensibly based on the cases of *Brindamour v. Murray* (1936) 7 Cal.2d 73 [59 P.2d 1009] and *Megowan v. City of Los Angeles* (1936) 7 Cal.2d 80 [59 P.2d 1012].

The majority creates this "special" test by analogizing the authorized carrying of a service revolver by an "off-duty" police officer and its negligent discharge to the negligent driving of a public entity's automobile by an employee to whom the car is entrusted for such driving. The majority rationalizes that a gun, like a car, is a "potentially dangerous instrumentality." (See maj. opn., *ante*, at p 1620.)

There are two problems with the majority's analysis. First, while an automobile, like a pair of scissors, a glass bottle, or a child's swing set, for example, is a *potentially* dangerous instrumentality, it is not an *inherently* dangerous instrumentality. An automobile, like a pair of scissors, a glass bottle, or a swing set, has an intended function which does not necessarily involve death or serious injury when it is properly used. Thus, it is not an inherently dangerous instrumentality. It only becomes dangerous when it is improperly operated. In contrast, a gun's inherent function is to cause death or injury. This function exists regardless of whether it is properly or improperly used. Thus, a gun *is* an inherently dangerous instrumentality. To analogize a gun to a car based on *inherent* dangerousness is therefore inappropriate. Second, as explained below, neither *Brindamour* nor *Megowan*, which the majority cites in support of its analogy, refers to an automobile as a potentially or inherently dangerous instrumentality, which supposed characterization is the basis for the majority's "special" test.

In *Brindamour*, a city was held not liable for injuries caused by a collision between the plaintiff's car and a city car being used by a police officer who was driving his wife home from dinner. The majority fails to note that in *Brindamour*, although the car had been assigned to the police officer for use "in his employment," the plaintiff conceded that at the time of the accident the officer was using the car in his own private business. (7 Cal.2d at p. 76.) In fact, the plaintiff's argument that the city should be held liable was based not on the fact that the officer was acting within the scope of his employment at the time of the accident, but rather on his contention that a section of the Vehicle Code made the city liable merely because it owned the vehicle in question. (*Ibid.*)

Because the *Brindamour* opinion was grounded on the premise that the police officer was *not* acting within the scope of his employment when he

negligently drove the city automobile for the purpose of taking himself and his spouse home from dinner, *Brindamour* is clearly inapplicable here, where the issue is whether Henriksen's authorized carrying of a gun while "off duty" and its accidental discharge may be within the scope of his employment. Furthermore, *Brindamour* makes no mention of "dangerous instrumentalities" and the need for special rules related to such instrumentalities.

So, too, *Megowan* contains no discussion about the need for special rules as to "dangerous instrumentalities" used by public employees. Although it does contain holdings related to the scope of employment, it does not create any special tests which differ from, or which contain elements other than are contained in, the basic test for the determination of scope of employment applied by the court in *Mary M.*

Specifically, in *Megowan*, Meador, a fireman, was driving a city-owned car one Saturday morning when he collided with a car driven by plaintiff Megowan and ridden in by plaintiff Onstad. The car had been assigned to the board of commissioners for use for field supervision. Meador had been ordered by his captain to take the car to the home of the president of that board and to report to the president as the president had requested. The president intended to use the car for two purposes: to go to his official office and thence to inspect two fire engine companies, and to purchase food for the needy and deliver the same to the residence of another city official.

Plaintiffs sued the city and Meador, and judgments in favor of both plaintiffs were entered against both defendants. The city appealed, contending there was insufficient evidence that Meador was acting within the scope of his employment at the time of the collision, and emphasized that it was not a legitimate municipal purpose to use a city car to go from one's home to one's office, or to use such car for private purposes unconnected with the performance of one's official duties.

The Supreme Court affirmed the judgments, holding that: "[The president of the board] had *authority* to use the car on business connected with his duties as president and member of the board of fire commissioners. It would be unlawful for him to use it for his own private purposes unconnected with the performance of his official duties. The fact that his own personal convenience might incidentally be involved would not necessarily relieve the city so long as the main purpose of the use was official in its nature. [The fire captain], in the performance of his duties, unquestionably had the power to instruct the defendant Meador to comply with the request of the commissioner and it was not for Meador under the circumstances here shown to question the order of his superior. It was not unlawful nor beyond an

authorized corporate purpose to have a city automobile sent to the house of [the president] to transport him in the pursuit of certain municipal purposes such as on a tour of fire department inspection or for necessary or appropriate supervision of the fire department equipment, property or personnel or for any other legitimate business of the fire commission." (7 Cal.2d at p. 83, italics added.)

Obviously, nothing in this holding supports the majority's conclusion that Henriksen, as a matter of law, was acting outside the scope of his employment at the time of the gun's discharge. In fact, the *Megowan* case supports Henriksen's position that the discharge occurred within the scope of his employment. Just as it was not outside the City of Los Angeles's municipal purpose to authorize a city-owned car to be used to transport a city official for business purposes while the official was also pursuing some personal business, so too it was not outside the City of Rialto's municipal purpose to authorize Henriksen to carry a city-owned revolver for law enforcement purposes while Henriksen was also pursuing his personal affairs.

As is apparent from the above discussion, the majority has failed to establish the analytical framework necessary to justify departure from the well-established scope of employment test (which broad test has been applied, over the years, to a myriad of fact patterns), nor has the majority established that there is precedent for applying a special scope of employment test if the facts of a case involve the employee's use of a dangerous instrumentality.

### F. *The Majority Improperly Relies on Facts Not Established as Uncontroverted to Support Its Analysis*

The majority's opinion is replete with references to "facts" which have never been found to be true by a trier of fact. For example, the majority states that "Rialto provided special weapons training to its police officers so that they would know how to handle their weapons both on and off duty." (See maj. opn., *ante*, at p. 1620.) It also states that "Rialto, by training its officers, has taken steps to reduce the risk of harm." (See maj. opn., *ante*, at p. 1621.) However, neither the "fact" of training on how to handle weapons both on and off duty nor the "fact" that the training was intended to and/or did reduce the risk of harm, was established as uncontroverted fact. (Cf. Rialto's separate statement of undisputed material facts with Henriksen's separate statement in opposition.) Although Henriksen's declaration in opposition to Rialto's motion stated that Rialto has a policy as to which type and caliber of weapons could be carried by "off duty" officers, and that Henriksen was in "charge of firearms training," there is no evidence in the

record that Rialto provided "special weapons training" to its officers so they would know how to handle their weapons "both on and off duty," nor is there any evidence as to the purpose or effect of such training. This lack of evidence is no doubt due to the fact that neither party felt that the issue of training was germane to Rialto's motion, which related solely to the issue of scope of employment, and thus neither party attempted to establish as uncontroverted any facts related to such training.

The majority also states that ". . . the risk [of harm] in the present case was substantially altered by Henriksen's activities once he was no longer on duty, in particular by his consumption of alcohol." (See maj. opn., *ante*, at pp. 1621-1622.) Once again, the majority relies on a "fact" which was not established as uncontroverted, and which, in fact, the parties did not address in the motion and opposition thereto; neither Rialto's separate statement of undisputed facts nor Henriksen's separate statement in opposition made any mention of alcohol consumption by Henriksen. Furthermore, not only was Henriksen's consumption of alcohol not established as an uncontroverted fact, but also, even if such was established as undisputed, the risk-enhancing effects of such alcohol consumption also were never so established.[7]

Perhaps Rialto did not assert as an undisputed fact Henriksen's alcohol consumption because it believed that his consumption of alcohol was simply irrelevant to the issue of whether he was acting within the scope of employment by wearing a gun while "off duty," or because the evidence was not such as could be used to establish, as an undisputed fact, that Henriksen was impaired by the alcohol he had consumed. Whatever the reason, it is not the appellate court's function, in order to affirm a trial court's decision on a summary judgment motion, to assume to be undisputed facts which were never mentioned in the parties' moving and opposition papers.

G. *The Majority's Application of the Policy Objectives Behind the Doctrine of Respondeat Superior to Assumed Undisputed Facts of This Case Is Strained and Illogical*

The majority, relying on *Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d 202, 214-217, identifies three policy objectives behind the doctrine of respondeat superior: (1) prevention of recurrence of the tortious conduct; (2) greater assurance of compensation for the victim; and (3) spreading the risk of loss among the beneficiaries of the enterprise. After considering these policy considerations, it then concludes that they militate against imposing

---

[7]Henriksen stated in his deposition testimony that he had consumed three light beers between 11:30 p.m. and 1 a.m., that he had not had any other alcoholic beverages in the preceding twenty-four hours, and that he did not consider himself to be intoxicated.

liability on Rialto for tortious conduct by its police officers arising out of their carrying their service revolvers while "off shift."

Although I have concluded that there are certain triable issues of material fact regarding whether Henriksen was in the scope of employment at the time his service revolver discharged and wounded Masotto and that for this reason alone the trial court's summary judgment should be reversed, I feel compelled to respond to the majority's effort to conclude, based on public policy considerations and as a matter of law, that: a public entity may not be held liable for indemnification and failure to provide a defense to one of its police officers who may be found liable for the negligent discharge of his service weapon which he is carrying "off shift," even when the public entity has authorized and encouraged its officers to carry weapons while "off duty" so that they may perform law enforcement duties more effectively while "off shift." In making this response, I shall assume, as has the majority, that it is undisputed that Rialto has a policy which allows, if not encourages, officers to carry their service weapons while "off shift" and that this policy is intended to allow the officers to provide effective law enforcement services even while "off shift."

## 1. *Prevention of Recurrence of the Tortious Conduct*

The first policy objective which favors applying the doctrine of respondeat superior is "that imposing liability on the employer may prevent recurrence of the tortious conduct, because it 'creates a strong incentive for vigilance by those in a position "to guard substantially against the evil to be prevented." ' [Citation.]" (*Mary M.* v. *City of Los Angeles, supra*, 54 Cal.3d at p. 214.)

The majority contends that this policy militates against the application of the doctrine in this case, because, while "[r]equiring Rialto to indemnify[8] Henriksen might help to prevent the recurrence of the conduct complained of if it induced Rialto to reverse its policy of permitting[9] off-duty officers to carry loaded weapons," on the other hand, "[t]he negative impact of such a

---

[8]As alluded to earlier, we are not concerned in this appeal with the public policy factors underlying the public entity indemnification statutes upon which Henriksen's cross-complaint is based. The issue is whether the undisputed facts were sufficient to bring him within the coverage of the "scope of employment" provision of the pertinent indemnification and entitlement to defense Government Code sections. Therefore, the thrust of the above discussion should be on the policy considerations regarding whether, under the assumed uncontroverted facts, Henriksen was in the scope of employment; not whether Rialto should have to indemnify him.

[9]The undisputed fact presented by Henriksen, which I assume to be true for purposes of this discussion, was that Rialto "encouraged," not merely "permitted," its officers to carry weapons while "off duty."

policy would be apparent because off-duty officers would be unable to appropriately respond to emergencies," and ". . . requiring indemnification would provide no incentive to the off-duty officers to take more care in handling their weapons in casual social situations." (Maj. opn., *ante* at p. 1621.) The majority also notes that although requiring indemnification *might* have the effect of improving officer training in handling weapons, such an effect is "unlikely" given the fact that Henriksen is the officer in charge of firearm training!

Thus, after first acknowledging the great importance to the city and its citizens of having *armed* "off-duty" police officers available for law enforcement emergencies—a benefit so great that it apparently outweighs the benefits of preventing future recurrences of incidents such as the one which forms the basis of Masotto's complaint—the majority concludes that requiring indemnification would provide no incentive to "off-duty" officers to be more careful (the implication being that by thus providing officers with an incentive to be more careful by way of a no-indemnification policy, a recurrence of the tortious conduct can be prevented), and then assumes that there is no beneficial effect to be obtained by requiring indemnification, because even if Rialto were held liable to indemnify, there would be no change either in the manner in which its officers were instructed on "off duty" weapons safety or as to the identity of the instructor. (Maj. opn., *ante* at p. 1621.)

The fallacy in this reasoning is patent. First, the purpose of this public policy is to establish an incentive for the *employer* (not the employee) to take precautions to guard against the employee's potential tortious conduct. Second, while a "no-indemnification" policy might make "off-duty" peace officers more careful and thereby reduce the number of occurrences (although I cannot help but think that the risk of physical harm resulting from careless weapons' techniques probably makes most police officers extremely careful, regardless of the availability of indemnity for negligence), it will not, in and of itself, *prevent* all recurrences of the tortious conduct; as the old saw goes, "accidents will happen."

The only thing which would *totally* prevent a recurrence of the conduct in question would be an employer policy *forbidding* officers to carry weapons while "off duty." Furthermore, a "no-indemnification" policy without a total prohibition directive could well persuade officers not to carry their weapons while "off duty," where is the fairness in being expected to be ready to risk one's life at a moment's notice, at all hours of the day and night, not for one's own benefit, but for that of the general public, if one is also expected to shoulder the entire risk of accidents which may result from being in a state of constant readiness?

Finally, as to the majority's application of this first policy, it is amazing that the majority apparently assumes that Rialto has no control over how or by whom its police officers are trained, and that the majority has also assumed that it is unlikely that "further training would have altered the result in the present case," (maj. opn., *ante*, at p. 1621) particularly as the record is entirely lacking in any evidence of how such officers were trained in the past, or how they could be trained in the future.

In contrast, I believe application of the first policy factor to situations of this sort would strongly militate in *favor* of concluding that the tort was committed while Henriksen was acting within the scope of his employment. Such a conclusion would obviously motivate Rialto either to adopt a training program and rules governing the carrying of service revolvers by off-duty officers or to adopt a policy forbidding its police officers from carrying their weapons while off duty. Either of these measures, in turn, would tend to limit, if not totally prevent, recurrence of the accidental discharge of weapons carried by off-duty officers.

### 2.  *Assurance of Compensation for the Victim*

The second policy which favors applying the doctrine of respondeat superior is "to give greater assurance of compensation to the victim." (*Mary M. v. City of Los Angeles, supra*, 54 Cal.3d at p. 215.) The majority opines that this factor is particularly inapplicable here because the "question of compensating the victim is not directly presented in this appeal," given that Henriksen was seeking indemnification, and that the relationship between Masotto's compensation and Henriksen's indemnification is merely speculative. (Maj. opn., *ante*, at p. 1621.)

The majority misses the point behind *policy* considerations. Policy considerations are applied to a *class* of circumstances, not to the circumstances of a particular case. Thus, in *Mary M. v. City of Los Angeles, supra,* 54 Cal.3d 202, the California Supreme Court was not concerned with whether Sergeant Schroyer, who had raped Mary M., would be able to fully satisfy any judgment based on his tortious conduct. Instead, it was concerned with the fact that the Legislature has indicated, by adopting the California Tort Claims Act, that the imposition of the vicarious liability doctrine of respondeat superior on a public employer is an appropriate method of ensuring that the victims of police misconduct are compensated by declining to grant immunity to public entities for such misconduct. (54 Cal.3d at p. 215.)

So, too, here, the issue is not whether Henriksen will be able to satisfy any judgment obtained by Masotto, but whether the Legislature has indicated

that the imposition of vicarious liability on a public employer for an employee's tortious act is an appropriate method of ensuring that the victims of public employee *negligence* are compensated. The Legislature has so indicated. (Gov. Code, § 815.2.) I conclude that this second policy objective supports a finding that under the assumed undisputed facts, the negligent discharge of a service revolver by an off duty peace officer, who was encouraged by his public entity employer to carry it while off duty, was an act within the officer's scope of employment, making the employer also liable to the victim and thereby assuring the victim of a greater chance to be compensated for his/her injuries caused by the firing of the gun.

### 3. *Spreading the Risk of Loss Among Beneficiaries of the Enterprise*

The third policy which favors applying the doctrine of respondeat superior is that if there are "substantial benefits that the community derives from the lawful exercise of [the official authority at issue]" (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 217), then it is only fair that the community at large bear the risk of any cost resulting from the misuse of that authority. (*Id.* at pp. 216- 217.)

In applying this factor to this case, the majority once again uses facts which have not been adjudicated as being without dispute. It asserts that "Rialto, by training its officers, has taken steps to reduce the risk of harm." No such fact has been established as uncontroverted. There is an indication in the record that Rialto police officers receive weapons training, but the facts as to the nature, extent, and thrust of such training is unknown, especially as it may address the carrying of weapons by "off duty" officers; thus, the efficacy of the training to reduce the risk of any given harm cannot be determined either as a matter of fact or law.

In any event, the issue as to this policy objective is *not* whether Rialto attempted to *reduce* the risk, but whether whatever risk *remains* should be borne by the community in general or by the individual employee. Given the majority's recognition that there is a substantial benefit to the community from authorizing "off duty" employees to carry weapons (maj. opn., *ante,* at p. 1620), how can it be said, on the other hand, that the community should not bear the risks which accompany this benefit?

The majority also asserts that the nature of the risk posed by Rialto's policy of encouraging "off duty" officers to carry weapons was "substantially altered by Henriksen's activities once he was no longer on duty, in particular by his consumption of alcohol." (Maj. opn., *ante,* at pp. 1621-1622.) First, as previously noted, the effects, if any, of Henriksen's consumption of

alcohol on the "risk" involved have not been established as undisputed facts. Second, as to Henriksen's "alteration" of the risk posed, it would seem that the risk involved in encouraging "off duty" officers to carry weapons and expecting them to perform law enforcement activities as the need might arise inferentially would *include* the risk that any given "off duty" police officer might have consumed alcoholic beverages (or have taken medication altering his or her physical or mental abilities, or be physically unwell and perhaps unsteady) shortly before being called upon to perform as a peace officer.

In my view, when the City of Rialto authorizes and encourages its off-duty officers to carry their service guns so as to be better able to perform their law enforcement duties to protect the community of Rialto at all times, this "formidable power" has the potential for abuse and the cost resulting from the off-duty officer's misuse by negligence of such service weapon should be borne by the City of Rialto. (*Mary M.* v. *City of Los Angeles*, *supra*, 54 Cal.3d at pp. 216-217.)

## III

### CONCLUSION

Based on the foregoing authority and discussion, I would reverse the judgment and vacate the order granting Rialto's motion for summary judgment.