Filed 3/1/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>

MAYRA PEREZ,

     Plaintiff and Appellant,

v.

CITY AND COUNTY OF SAN FRANCISCO,

     Defendant and Respondent.

</td><td>

A161279

(San Francisco County
Super. Ct. No. CGC-18-569711)

</td></tr>
</table>

A police officer employed by the police department (Department) of the City and County of San Francisco (City) left his Department-approved firearm unsecured in his vehicle after returning home from an assigned training session. That evening his vehicle was burglarized and the firearm stolen. Soon thereafter, the son of Mayra Perez (Plaintiff) was killed with that weapon. Plaintiff sued the City, but the trial court granted the City's motion for summary judgment, finding as a matter of law the officer's conduct was not within the scope of his employment. We reverse. In the context of the enterprise of policing, a jury could reasonably find the officer's failure to safely secure his weapon is " ' "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of

1

the employer's business." ' " (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003 (*Farmers*).)

BACKGROUND

Marvin Cabuntala was an officer with the Department. The Department issued officers a "primary" firearm and also allowed—but did not require—officers to carry a secondary firearm when on duty, if that firearm had been approved and qualified by the Department. The Department also authorized officers to carry loaded handguns when off duty, as long as they had their Department identification and star with them. In 2015, the Department issued a bulletin governing firearm security in vehicles. The bulletin provided Department officers "are responsible for knowing the location of firearm(s) under their care and control; and ensuring those firearm(s) are secure at all times, whether on or off duty." The bulletin set forth specific guidelines for securing firearms in an unattended vehicle and directed that, if an officer could not secure a firearm in accordance with the guidelines, the officer "shall not leave a firearm in an unattended vehicle."[1]

Cabuntala had a primary firearm issued by the Department. He also owned a personal gun that the Department had approved and qualified as a secondary firearm. Cabuntala regularly carried this secondary firearm on duty, as was common among Department officers. He also regularly transported it in his vehicle while commuting to and from work. In addition, Cabuntala regularly carried this firearm when off duty, out of concern for his and his family's safety due to his recognizability as a police officer.

In addition to being an officer, Cabuntala was also a Department "specialist." Specialists work with a special operations group outside of

_____

[1] State law also requires peace officers to secure handguns in unattended vehicles. (Pen. Code, §§ 25140, 25452.)

2

patrol assignments, responding to incidents like hostage-taking and riot control. Cabuntala testified at his deposition that specialists are "on call 24/7" and that he has responded at all hours outside of his regular schedule.[2] Specialists were not permitted to respond to incidents without a firearm.

On August 11, 2017, the City assigned Cabuntala to a training session in a different county. He drove his personal vehicle from his home to the training site. Firearms were not allowed at the training session. However, Cabuntala brought his personal, secondary firearm with him when he drove to the training session, "Because I was in -- I was still in a police capacity working, and also . . . I believe the main reasons is the jail was right next door to the facility, and that was my reason for bringing it."[3]

The temperature was hot the week of the training. The training was approximately eight hours, outdoors, and involved the participants running in a simulated scenario. Cabuntala wore full body protective clothing. He testified that he had a history of heat exhaustion that was documented with the Department, and he believed he suffered from symptoms of heat exhaustion that day.

When the training was over, Cabuntala drove home, arriving shortly before the end of his scheduled work hours. That day, he failed to follow his

---

[2] The City submitted evidence that specialists are not on call. However, "[b]ecause this is an appeal from a grant of summary judgment . . . , . . . 'our account of the facts is presented in the light most favorable to the nonmoving party below . . . and assumes that, for purposes of our analysis, [the nonmoving party's] version of all disputed facts is the correct one.'" (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 668.)

[3] The parties stipulated that the training session was adjacent to a county jail.

usual practice of securing his personal, secondary firearm inside his house. Instead, he left the firearm unsecured inside his vehicle.

That night, Cabuntala's vehicle was broken into and his firearm was stolen. Cabuntala did not realize the firearm was stolen until some days later. In the interim, the firearm was used to kill Plaintiff's son.

Plaintiff sued Cabuntala, the City, and others. The City moved for summary judgment on the ground that the undisputed facts demonstrated Cabuntala was not acting within the scope of his employment. The trial court agreed and granted summary judgment for the City. This appeal followed.

## DISCUSSION

I.    *Standard of Review*

"We review the trial court's decision to grant [the defendant's] motion for summary judgment de novo. [Citation.] Summary judgment must be granted if all the papers and affidavits submitted, together with 'all inferences reasonably deducible from the evidence' and uncontradicted by other inferences or evidence, show 'there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) Where, as here, the defendant is the moving party, [the defendant] may meet the burden of showing a cause of action has no merit by proving one or more elements of the cause of action cannot be established. (See *id*., subd. (*o*)(1).) Once the defendant has met that burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action. [Citation.] We must consider all evidence in the light most favorable to the nonmoving part[y], which in this case [is] the plaintiff[]." (*Marez v. Lyft, Inc.* (2020) 48 Cal.App.5th 569, 576–577 (*Marez*).)

4

II.     *Respondeat Superior*

A.     *Legal Principles*

" 'The doctrine of respondeat superior holds an employer liable for torts of its employees committed within the scope of their employment.' " (*Marez, supra,* 48 Cal.App.5th at p. 577.) "[R]espondeat superior applies to public and private employers alike." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209 (*Mary M.*); see Gov. Code, § 815.2, subd. (a) ["A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."].) "The question of scope of employment is ordinarily one of fact for the jury to determine." (*Mary M.,* at p. 221.)

California courts use "two tests . . . 'for scope of employment under the respondeat superior doctrine.' [Citation.] 'Under one test, the employer is liable if the activities that caused the employee to become an instrument of danger to others were undertaken with the employer's permission and were of some benefit to the employer, or in the absence of proof of benefit, the activities constituted a customary incident of employment. [Citation.]' [Citation.] The second test . . . provides 'an employee's conduct is within the scope of . . . employment if (1) the act performed was either required or incident to [the employee's] duties or (2) the employee's misconduct could be reasonably foreseen by the employer in any event.' " (*Marez, supra,* 48 Cal.App.5th at p. 577.)

The application of these tests depends, in part, upon the underlying rationale behind respondeat superior. "[Respondeat superior] is based on ' "a rule of policy, a deliberate allocation of a risk. The losses caused by the torts

5

of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business." ' " (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 (*Perez*).) "[T]he central justification for respondeat superior[ is] that losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business." (*Farmers, supra,* 11 Cal.4th at p. 1004.) "The doctrine is a departure from the general tort principle that liability is based on fault. [Citation.] . . . Respondeat superior is based on ' "a deeply rooted sentiment" ' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities." (*Mary M., supra,* 54 Cal.3d at p. 208; see also Lindahl, 1 Modern Tort Law (2d ed. 2021) Employer Liability for Torts of Employees, § 7:4 ["The enterprise liability theory of liability, followed in California, provides that the modern and proper basis of vicarious liability of the master is not the master's control or fault but the risks incident to the master's enterprise."].)

"In some respects, the rationale underlying respondeat superior is similar to that underlying the Workers' Compensation Act. Both fields of law allow recovery for the injured party irrespective of proof of the employer's fault. Both are concerned with the allocation of the cost of industrial injury. [Citation.] 'The proper test [for respondeat superior] bears far more resemblance to that which limits liability for worker's compensation than to the test for negligence. The employer should be held to expect risks, to the public also, which arise "out of and in the course of" [the] employment of labor.' " (*Perez, supra,* 41 Cal.3d at pp. 967–968, fn. omitted.) Thus, for respondeat superior purposes, " 'A risk arises out of the employment when "*in the context of the particular enterprise* an employee's conduct is not so

6

unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' *to the enterprise undertaken by the employer.* [Citation.]" [Citation.] Accordingly, the employer's liability extends beyond [the employer's] actual or possible control of the employee to include *risks inherent in or created by the enterprise.*'" (*Farmers, supra,* 11 Cal.4th at p. 1003.)

The scope of employment test we utilize in this case focuses on whether "the employee's misconduct could be reasonably foreseen by the employer . . . ." (See *Marez, supra,* 48 Cal.App.5th at p. 577.) This test is based on the understanding that " '[o]ne way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was *a generally foreseeable consequence of the activity.* However, "foreseeability" in this context must be distinguished from "foreseeability" as a test for negligence. In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas "foreseeability" as a test for *respondeat superior* merely means that *in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Farmers, supra,* 11 Cal.4th at pp. 1003–1004.) Thus, "an employee's tortious act may be within the scope of employment even if it contravenes an express company rule and confers no benefit to the employer." (*Id.* at p. 1004.) In contrast, "an employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes. [Citations.] Thus, if the employee . . . acts out of 'personal malice

7

unconnected with the employment' [citation], or if the misconduct is not an 'outgrowth' of the employment [citation], the employee is not acting within the scope of employment.  Stated another way, '[i]f an employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior.'  [Citation.]  In such cases, the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business." (*Id.* at pp. 1004–1005.)

Three policy objectives drive the analysis of scope of employment. (*Mary M., supra,* 54 Cal.3d at p. 214; *Farmers, supra,* 11 Cal.4th at p. 1013.) The first is "to prevent recurrence of the tortious conduct," recognizing that imposing vicarious liability " ' "creates a strong incentive for vigilance by those in a position 'to guard substantially against the evil to be prevented.' " ' " (*Farmers,* at p. 1013.)  The second policy objective is "to give greater assurance of compensation to the victim."  (*Id.* at p. 1016.)  The third is to "ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury."  (*Ibid.*)

*Mary M.* considered "whether the three policy objectives underlying respondeat superior would be achieved by applying the doctrine when a police officer on duty misuses [the officer's] official authority and commits an act of rape." (*Mary M., supra,* 54 Cal.3d at p. 214.)  The court found the first objective would be achieved because "[t]he imposition of liability on public entities whose law enforcement officers commit sexual assaults while on duty would encourage the employers to take preventive measures," and "would not be likely to cause public entities to take preventive measures that would impair the effectiveness of law enforcement activities. . . . 'We doubt that

8

police departments would deprive their officers of weapons or preclude them from enforcing the laws . . . .' " (*Id.* at pp. 214–215.) The second objective also weighed in favor of liability, as the court noted both the Legislature and courts have recognized that holding a public entity vicariously liable "is an appropriate method to ensure that victims of police misconduct are compensated." (*Id.* at pp. 215–216.) As for the third objective, the court reasoned, "society has granted police officers extraordinary power and authority over its citizenry. An officer who detains an individual is acting as the official representative of the state, with all of its coercive power. As visible symbols of that power, an officer is given a distinctively marked car, a uniform, a badge, and a gun. As one court commented, 'police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.' [Citation.] Inherent in this formidable power is the potential for abuse. The cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power." (*Id.* at pp. 216–217.)

Two other cases cited by the parties further illustrate these principles. In *Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, a construction subcontractor maintained a trailer on a jobsite with showers and lockers for its employees. (*Id.* at pp. 614–615.) The subcontractor's employees worked around the clock in three shifts, and supervisors in need of extra help would look in the trailer to see if any workers who had just completed a shift wanted to work overtime. (*Id.* at p. 615.) Workers kept beer in the trailer and sometimes drank there after a shift ended with supervisors' knowledge and participation. (*Ibid.*) On the day in question, two of the subcontractor's

workers drank beer from the trailer after work. (*Ibid.*) After a few hours, they approached the employee of another contractor, who was operating a bulldozer onsite, and asked for a ride; when he refused, they assaulted him and another who tried to come to his aid. (*Id.* at pp. 615–616.) The court affirmed the jury's finding that the subcontractor was liable for the injuries, reasoning that even though the subcontractor's employees were not on duty at the time of the assault, it took place on the jobsite; the employees' presence on site after their shift ended was not unusual and was of some benefit to the subcontractor; the subcontractor knew and implicitly permitted off-duty employees to drink and socialize on site; and the dispute, over whether off-duty employees are entitled to rides on work equipment, was an outgrowth of the employment relationship. (*Id.* at pp. 617–624.)

On the other hand, in *Farmers,* a deputy sheriff working at the county jail sexually harassed other deputy sheriffs during work hours while the deputies were on duty. (*Farmers, supra,* 11 Cal.4th at pp. 998–999, 1007.) The Supreme Court found the conduct was not within the scope of employment: the harassing acts "were motivated for strictly personal reasons unrelated to the guarding of inmates or the performance of any other duty of a deputy sheriff at a county jail," were "not reasonably necessary to [the harassing employee's] comfort, convenience, health, and welfare while at work," and were not "precipitated by a work-related dispute over the performance of his duties." (*Id.* at p. 1007.) Moreover, while workplace sexual harassment in general is a foreseeable issue, the question for respondeat superior purposes is whether it is " ' " 'typical of or broadly incidental' *to the enterprise undertaken by the employer*." ' [Citations.] Thus, it is not enough that a risk be neither unusual nor startling as a general matter; rather, the risk must be evaluated in the context of the employer's

10

particular enterprise," and there was no evidence that workplace sexual harassment was "typical of or broadly incidental to the particular enterprise here—a county jail." (*Id.* at p. 1009.)

B. *Police Officers' Negligent Mishandling of Firearms*

Before turning to the specific facts of this case, we consider the risk that a police officer will negligently mishandle a firearm "in the context of [a police department's] particular enterprise."[4] (*Farmers, supra,* 11 Cal.4th at p. 1009.) Firearms are critical to police officers' ability to perform their jobs, even when they are not in active use: "[A holstered revolver] enables the officer to make arrests, to interrogate suspects, and to carry on [the officer's] multifarious duties with the knowledge that if there develop serious resistance or threat of danger, [the officer] can protect . . . even against more than one potential assailant. . . . The gun provides effective means of law enforcement because it continually gives a measure of safety to the officer." (*Oakland Police Officers Association v. City of Oakland* (1973) 30 Cal.App.3d 96, 100 [holding a police officer's service revolver is safety equipment for purposes of the Labor Code].) "[P]eace officers must definitionally be always prepared to keep the peace, which in the American way of things requires a firearm to be at the ready." (*Sacramento County Deputy Sheriffs' Assn. v.*

---

[4] Other law enforcement agencies are engaged in similar enterprises as police departments and have employees with similar duties to police officers. However, because broader terms such as "law enforcement" and "peace officer" may also include other enterprises and duties, we will refer to the enterprise of policing/police departments and police officers. (See *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 512 [discussing various constructions of the term "law enforcement"]; *People v. Pennington* (2017) 3 Cal.5th 786, 792–793 ["Chapter 4.5 [of the Pen. Code] contains over 100 sections and subdivisions authorizing public agencies to confer the status and powers of a peace officer on the members of a host of state and local personnel categories, subject to an intricate array of conditions and limitations."].)

11

*County of Sacramento* (1990) 220 Cal.App.3d 280, 288, fn. 9; see also *Riverside Sheriffs' Assn. v. Board of Administration* (2010) 184 Cal.App.4th 1, 12 ["tasks routinely associated with the job of peace officers" include "use [of] weapons"].)

The central role of firearms in policing is fairly unique to this enterprise. "Few other occupations *require* the ability to possess a firearm . . . ." (*In re Evans* (1996) 49 Cal.App.4th 1263, 1271 [finding rational a statute's limitation of the right to appeal a firearms prohibition to peace officers convicted of certain offenses, even though the statute did "not extend to *any* person whose occupation requires the use of a firearm"].) As *Mary M.* explained, police officers act "as the official representative of the state, with all of its coercive power," and one of the "visible symbols of that power" is "a gun." (*Mary M., supra,* 54 Cal.3d at p. 216.)

The City points to one case finding as a matter of law that an officer's off-duty negligent mishandling of his service revolver was not within the scope of employment, *Henriksen v. City of Rialto* (1993) 20 Cal.App.4th 1612 (*Henriksen*).[5] We examine the reasoning in the case in detail. Henriksen, a city police officer, went to a bar after his shift ended to drink and socialize with others, including a longtime friend. (*Id.* at p. 1616.) Before going to the

---

[5] Another case cited by the parties involving an officer's off-duty firearm use is inapposite. In *Inouye v. County of Los Angeles* (1994) 30 Cal.App.4th 278, an off-duty officer witnessed the plaintiff committing a public offense, attempted to make an arrest, and shot the plaintiff with his personal firearm when the plaintiff resisted. (*Id.* at p. 280.) The Court of Appeal held that, because state law authorized the officer to make an arrest when a public offense is committed in his presence, the officer was "indisputably" acting within the scope of employment when he shot the plaintiff while attempting to effectuate an arrest. (*Id.* at pp. 281 & fn. 3, 284.)

bar, Henriksen put his service revolver in his waistband; he testified the police department encouraged off-duty officers to carry their service revolvers. (*Id.* at pp. 1615–1616.) After the bar closed, the group moved to another location and, as Henriksen was walking, he adjusted his weapon and it discharged, hitting his friend. (*Ibid.*) In a divided opinion, the Court of Appeal affirmed summary judgment for the city. (*Id.* at p. 1614.) The majority reasoned, "the incident did not occur during working hours, was not accomplished by use of Henriksen's authority as a police officer, did not occur in the course of acts that Henriksen was carrying out under his employer's instructions or on his employer's behalf[,] . . . did not occur after Henriksen had drunk alcohol provided by the employer or permitted by the employer on the employer's premises[, and] . . . the relationship between Henriksen and [his friend] predated Henriksen's employment by many years and did not arise out of the employment relationship." (*Id.* at pp. 1619–1620.)

The majority acknowledged that Henriksen's firearm was city-issued and -authorized, and "[t]he risk which existed in the present case was the risk inherent in having an officer carry a gun while engaged in activities other than active law enforcement. . . . [¶] The question presented here is, to the extent the risk of harm could not be eliminated, who should bear the cost of the risk and any resulting injury?" (*Henriksen, supra,* 20 Cal.App.4th at p. 1620.) The majority analogized guns to automobiles because both were "potentially dangerous instrumentalit[ies]" and concluded that, like automobiles, the use of a gun must be for "employer business" to fall within the scope of employment. (*Id.* at pp. 1620–1621.) The majority concluded, "As with automobiles, when weapons are used for law enforcement purposes, liability for harm which results would properly extend to the employer. The mere presence of the weapon, however, without more is not sufficient to

13

impose liability on the employer for all of the employee's actions." (*Id.* at p. 1621.)

The majority then considered whether the three policy objectives discussed in part II.A above supported this conclusion. As for the first, applying respondeat superior "might help to prevent recurrence of the conduct complained of if it induced [the city] to reverse its policy of permitting off-duty officers to carry loaded weapons. The negative impact of such a policy would be apparent because off-duty officers would be unable to appropriately respond to emergencies." (*Henriksen, supra,* 20 Cal.App.4th at p. 1621.) The majority also found it unlikely that any improvement in "officer training in handling of weapons to minimize incidents" resulting from the application of vicarious liability "would have altered the result in the present case" because Henriksen was the officer in charge of such training. (*Ibid.*) The policy objective of assuring compensation for the victim was "inapplicable to the case before us because the question of compensating the victim is not directly presented in this appeal."[6] (*Ibid.*) As for the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise, the majority noted the city had "taken steps to reduce the risk of harm" by

---

[6] The issue had been raised in a cross-complaint for indemnification filed by Henriksen against the city, based on the claim that his conduct was within the scope of his employment. (*Henriksen, supra,* 20 Cal.App.4th at p. 1615.) The majority applied the test for scope of employment as articulated in respondeat superior cases without explicitly discussing its applicability (*id.* at pp. 1618–1622); the dissenting justice opined that "the term 'scope of employment' has essentially the same meaning when used in connection with a public entity's liability to the victim of a tortious act by its employee pursuant to respondeat superior as it does when used in connection with the public entity's duty to indemnify and defend the employee upon whose actions the victim's claim is based" (*id.* at p. 1633 (dis. opn. of Timlin, J.)).

14

providing training, and discussed cases in which "[t]he unpredictable consequences of alcohol consumption necessarily changed the evaluation of whether 'in the context of the particular enterprise an employee's conduct is . . . so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Id.* at p. 1622.) The majority concluded Henriksen's "consumption of alcohol changed the nature of the risk facing [the city] in permitting its off-duty officers to carry their weapons. To require indemnification in the present case would place [the city] in the position of assuming an unacceptable risk of liability for the actions of its off-duty officers." (*Ibid.*) Instead, "[t]he officers themselves, when they make the decision to socialize after hours, are the ones in a position to take the necessary safeguards to mitigate any increased risk; if they fail to do so they, not the public, must bear the loss." (*Ibid.*)

The dissenting justice noted Henriksen's evidence that, "even though he was 'off shift' (1) he was expected to perform law enforcement activities as they might arise, (2) he was encouraged to carry his service weapon for that purpose, (3) he was authorized to carry a particular type of weapon, and no other, when 'off shift,' and (4) it was only his status as a police officer which caused him to carry this weapon when 'off shift.' " (*Henriksen, supra,* 20 Cal.App.4th at p. 1635 (dis. opn. of Timlin, J.).) Taking these facts as true, the dissenting justice concluded, "[the city] could reasonably foresee that Henriksen would not only be carrying the weapon but also that it might accidentally discharge and result in someone being shot." (*Id.* at pp. 1635–1636 (dis. opn. of Timlin, J.).) Henriksen's alcohol consumption did not materially change this analysis: "for an employee who is expected to be 'on call' at all times, the fact of engagement in the normal activities of daily life, including attending social functions and some consumption of alcoholic

15

beverages, would not necessarily cause acts arising out of the employee's work-related duties to fall outside the scope of employment." (*Id.* at p. 1636 (dis. opn. of Timlin, J.).)

The dissenting justice found the majority's automobile analogy inappropriate because, "while an automobile . . . is a *potentially* dangerous instrumentality, it is not an *inherently* dangerous instrumentality. . . . It only becomes dangerous when it is improperly operated. In contrast, a gun's inherent function is to cause death or injury. This function exists regardless of whether it is properly or improperly used. Thus, a gun *is* an inherently dangerous instrumentality." (*Henriksen, supra,* 20 Cal.App.4th at p. 1637 (dis. opn. of Timlin, J.).)

Finally, the dissenting justice disagreed with the majority's analysis of the three policy objectives. The dissent rejected the majority's conclusion that additional training would not have altered the outcome because "the record is entirely lacking in any evidence of how such officers were trained in the past, or how they could be trained in the future." (*Henriksen, supra,* 20 Cal.App.4th at p. 1643 (dis. opn. of Timlin, J.).) Instead, the dissent found imposition of liability "would obviously motivate [the city] either to adopt a training program and rules governing the carrying of service revolvers by off-duty officers or to adopt a policy forbidding its police officers from carrying their weapons while off duty. Either of these measures, in turn, would tend to limit, if not totally prevent, recurrence of the accidental discharge of weapons carried by off-duty officers." (*Ibid.*) As for the second factor, the dissenting justice disagreed that the posture of the present case was dispositive because "[p]olicy considerations are applied to a *class* of circumstances, not to the circumstances of a particular case." (*Ibid.*) In the class of circumstances presented by the case—"the negligent discharge of a

16

service revolver by an off duty peace officer, who was encouraged by his public entity employer to carry it while off duty"—finding the conduct within the scope of the officer's employment would "mak[e] the employer also liable to the victim and thereby assur[e] the victim of a greater chance to be compensated for . . . injuries caused by the firing of the gun." (*Id.* at p. 1644 (dis. opn. of Timlin, J.).) With respect to the third objective, the dissenting justice queried, "Given the majority's recognition that there is a substantial benefit to the community from authorizing 'off duty' employees to carry weapons [citation], how can it be said, on the other hand, that the community should not bear the risks which accompany this benefit?" (*Ibid.*) Instead, "when the [city] authorizes and encourages its off-duty officers to carry their service guns so as to be better able to perform their law enforcement duties to protect the community . . . at all times, this 'formidable power' has the potential for abuse and the cost resulting from the off-duty officer's misuse by negligence of such service weapon should be borne by the [city]." (*Id.* at p. 1645 (dis. opn. of Timlin, J.).) As for Henriksen's consumption of alcohol, "it would seem that the risk involved in encouraging 'off duty' officers to carry weapons and expecting them to perform law enforcement activities as the need might arise inferentially would *include* the risk that any given 'off duty' police officer might have consumed alcoholic beverages (or have taken medication altering [the officer's] physical or mental abilities, or be physically unwell and perhaps unsteady) shortly before being called upon to perform as a peace officer." (*Ibid.*)

  C. *Analysis of the City's Liability*

  To prevail on its summary judgment motion, the City must demonstrate Plaintiff's cause of action has no merit by proving one or more

17

elements cannot be established. The City failed to do so.[7] The evidence, viewed most favorably to Plaintiff, is as follows. The Department allows officers to carry approved, secondary firearms while on duty and officers regularly do so. There is no evidence that such firearms are required to be left at the police station after an officer's shift is over; therefore, the Department knows or reasonably should know that officers transport these firearms on their commutes to and from work. The Department allows officers to carry handguns while off duty as long as they also carry indicia of their status as police officers. Department specialists may be called to respond to incidents at any time, and must carry a firearm when they respond. On August 11, 2017, Cabuntala—a Department officer and specialist—brought his Department-approved secondary firearm while traveling to a Department-assigned training session. He did so because he was on-duty and would be training near a county jail; a jury could infer Cabuntala thought he might be called to respond to an incident at the jail as an on-duty officer or specialist. The firearm was present in his vehicle upon his return home because he brought it to his assigned work location for these work-related purposes.

We consider these facts in the context of the enterprise of policing, the centrality of firearms to that enterprise, and the underlying rationale for respondeat superior that "losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business." (*Farmers, supra,* 11 Cal.4th at p. 1004.) Given this context, a jury could reasonably find a

---

[7] We need not decide whether the City failed to meet its initial burden, as Plaintiff argues, because even assuming it satisfied this burden, Plaintiff established a triable issue of material fact.

18

nexus between the Department's enterprise of policing and the risk that one of its officers would negligently fail to secure a Department-approved, secondary firearm upon returning home from work. (See *Marez, supra,* 48 Cal.App.5th at p. 582 [" '[T]here must be "a nexus between the employee's tort and the employment to ensure that liability is properly placed upon the employer." ' "].) This stands in sharp contrast to the risk of workplace sexual harassment at issue in *Farmers* which, although foreseeable "as a general matter," was not "typical of or broadly incidental to the particular enterprise" of the employer. (*Farmers,* at p. 1009.) Accordingly, we conclude a jury could reasonably find that Cabuntala's negligent failure to secure his Department-approved firearm in an unattended vehicle upon returning home from a Department-assigned training fell within the scope of his employment.

*Henriksen* does not alter this outcome. As an initial matter, it is readily distinguishable. Unlike in *Henriksen*, Cabuntala's possession of a Department-approved firearm was not the sole factor linking his conduct to his employment, and Cabuntala had not consumed alcohol before the tortious act. More significantly, we reject the *Henriksen* majority's reasoning because it fails to rigorously apply the rationale and objectives of California's enterprise approach to respondeat superior liability. The comparison of a police officer's misuse of a firearm to the misuse of an automobile fails to recognize the critical role of firearms in policing, as discussed above. The officer's off-duty consumption of alcohol was not unforeseeable, but rather was part of the officer's participation in normal activities. And the majority's conclusion that the public should not bear the risk of liability ignores the fundamental justification for respondeat superior that "losses fairly attributable to an enterprise—those which foreseeably result from the

19

conduct of the enterprise—should be allocated to the enterprise as a cost of doing business." (*Farmers, supra,* 11 Cal.4th at p. 1004.)

In any event, the three policy objectives undergirding enterprise liability support our conclusion in this case. The goal of preventing recurrence of the tortious conduct is served, because imposition of respondeat superior would likely prompt police departments to utilize more selective hiring practices, impose stricter regulations, and provide more training with respect to the handling of firearms on and off duty.[8] We note that the City does not suggest the imposition of liability will result in the Department barring officers, and particularly specialists, from carrying approved firearms off duty. Providing greater assurance of compensation to victims is also furthered. Finally, because the community benefits from police officers' authorized handling of firearms, the objective of "ensur[ing] that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury" (*Farmers, supra,* 11 Cal.4th at p. 1016) is served by

---

[8] With respect to hiring practices, for example, reforms have been suggested to either help police departments avoid hiring officers who were previously fired from other jurisdictions, or to mitigate the risk they will commit misconduct again if they are hired. (See Grunwald & Rappaport, *The Wandering Officer* (2020) 129 Yale L.J. 1676, 1759, 1762 [police departments hire such officers in part because they "do not always complete adequate background checks"; when knowingly hired, departments "should consider enhanced monitoring and support of [such officers] as a potential way to manage th[e] risk" of misconduct]; Assem. Floor Analysis of Sen. Bill No. 2 (2021-2022 Reg. Sess.) as amended Sept. 1, 2021, p. 4 [author's statement in support of bill creating decertification procedure for peace officers, subsequently enacted and codified at Stats. 2021, ch. 409, noting problem of "officers committing misconduct . . . [who] resign or are fired from their employer only to get rehired at another law enforcement agency and continue to commit serious acts of misconduct"].)

imposing liability on police departments when officers negligently mishandle those firearms. (*Mary M., supra,* 54 Cal.3d at pp. 216–217.)

We note that our reasoning does not extend beyond instances of officers' *negligent* mishandling of firearms. An officer who intentionally uses his authorized firearm to, for example, damage a neighbor's person or property as part of an ongoing dispute has "substantially deviate[d] from the employment duties for personal purposes" such that "the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business." (*Farmers, supra,* 11 Cal.4th at p. 1005, italics omitted.) A jury could reasonably conclude that Cabuntala, when he *negligently* failed to secure his firearm upon returning home from work, did not.

The City failed to demonstrate that Plaintiff cannot establish respondeat superior liability as a matter of law.[9]

## DISPOSITION

The judgment is reversed. Plaintiff is awarded her costs on appeal.

---

[9] Because of this conclusion, we need not and do not decide certain other arguments raised in Plaintiff's briefing: (1) the applicability and impact of the special/business errand exception to the going and coming rule (see *Sumrall v. Modern Alloys, Inc.* (2017) 10 Cal.App.5th 961, 964); (2) Cabuntala's allegedly tortious acts of failing to secure his firearm when leaving the training and failing to realize sooner the firearm was stolen, and whether Plaintiff forfeited any arguments based on those acts; or (3) Cabuntala's alleged heat exhaustion resulting from the training session. In addition, the City's motion below sought summary judgment solely on the basis that Cabuntala was not acting within the scope of his employment. The trial court therefore did not rule on any of the other elements of Plaintiff's claim, including proximate causation, and we express no opinion on the viability of those elements.

21

_____

SIMONS, J.

We concur.

_____

JACKSON, P. J.

_____

BURNS, J.

(A161279)

## Perez v. City and County of San Francisco (A161279)

Trial Judge:      Hon. Ethan P. Schulman

Trial Court:      San Francisco County Superior Court

Attorneys:

      Cotchett, Pitre, & McCarthy LLP, Frank M. Pitre and Donald Magilligan; Law Office of Valerie T. McGinty, Valerie T. McGinty for Plaintiff and Appellant.

      Dennis Herrera, City Attorney, Meredith Osborn, Chief Trial Deputy, James Hannawalt, Deputy City Attorney, for Defendant and Respondent.